OPINION OF THE COURT
Irving Lang, J.
Defendant’s motion to suppress the results of a breathalyzer test revives the issue of whether the failure to preserve the original test ampoule for reanalysis of blood alcohol content constitutes a violation of due process and of the right to a fair trial. The question has already resulted in conflicting lower court decisions in this State and indeed, conflicting rulings by appellate courts of many States. With some variations, the inconsistent decisions stem from the acceptance or rejection of expert testimony that test ampoules can be preserved for meaningful reanalysis. While many experts have testified on both sides of the question, no in-court experiment has been performed to test the validity of the cross contentions — until now.
THE FACTS
The defendant was indicted for two counts of assault in the second degree, operating a motor vehicle while under the influence of alcohol and leaving the scene of an acci *341 dent without reporting. The charges stem from an automobile accident where a woman was seriously injured. Following his arrest the defendant took a breathalyzer test which indicated a blood alcohol content greater than .1 of 1% by weight.
Three months after the indictment the court granted an order pursuant to the defendant’s motion under CPL 240.20 requiring the prosecution to produce the test ampoule for examination by a defense expert. The defendant was informed by the prosecutor that compliance was impossible since the original test ampoule had been destroyed in accordance with routine police procedure.
This resulted in the defendant’s motion to suppress the test results and any related testimony on the ground that his due process rights were violated in contravention of the principles set forth in Brady v Maryland (373 US 83).
PRESENT STATE OF THE LAW
Most courts dealing with this issue have relied on the duty of disclosure as enunciated by the United States Supreme Court in Brady v Maryland (373 US 83, supra). “[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” (373 US, at p 87; emphasis added.) In United States v Agurs (427 US 97) the Supreme Court held that even when there is no request or where a general request is made, the prosecution is still under a heavy duty to disclose all material evidence which is exculpatory. The court held (p 112) that the proper standard of materiality of undisclosed evidence is that if the omitted evidence creates a reasonable doubt of defendant’s guilt that did not otherwise exist, “constitutional error has been committed.”[1]
An expansion on this theme is furnished in the opinion of the Court of Appeals for the District of Columbia in United States v Bryant (439 F2d 642). There, the court stated (p *342 651) that “the duty of disclosure attaches in some form once the Government has first gathered and taken possession of evidence * * * Otherwise, disclosure might be avoided by destroying vital evidence before prosecution begins or before defendants hear of its existence * * * [B]efore a request for discovery has been made, the duty of disclosure is operative as a duty of preservation. Only if evidence is carefully preserved during the early stages of investigation will disclosure be possible later.” (Emphasis added.)
The substance of these decisions has been codified in New York’s Criminal Procedure Law. CPL 240 (subd 1, par [g]) states:
“1. [U]pon a demand to produce by a defendant against whom an indictment * * * is pending, the prosecutor shall disclose to the defendant and make available for inspection * * * or testing * * *
“(g) Anything required to be disclosed, prior to trial, to the defendant by the prosecutor, pursuant to the constitution of this state or of the United States.”
But how can the destruction of the test sample result in the suppression of exculpatory or favorable evidence for the accused when the test result is highly incriminatory? The Supreme Court of California in People v Hitch (12 Cal 3d 641, 648), posed the problem as follows, “We must therefore decide by what principles a court should determine a defendant’s claim for relief where, as here, the evidence subject to disclosure is no longer in existence and the court is therefore unable to ascertain whether such evidence was, or would have been, favorable to the defendant and material on the issue of his guilt or innocence.”
Two theories have evolved from courts which have ordered suppression of test results when the ampoule has not been preserved. The California court ruled that since there was a “reasonable possibility” that the “accuracy and credibility” of the results of the test could be impeached by retesting, suppression should result unless the test ampoule was preserved. The Court of Appeals of Oregon followed the reasoning of the Hitch court in State v Michener (25 Ore App 523).
*343 Taking a different tack but with the same result, the Supreme Court of Alaska suppressed a breathalyzer test based on the constitutional right of cross-examination. (Lauderdale v State, 548 P2d 376.)
It should be emphasized however that both suppression theories were predicated upon the finding of the California, Oregon and Alaska courts that reanalysis of the test ampoule was scientifically feasible.
Other jurisdictions have taken opposite views, based primarily on the premise that meaningful retesting is not scientifically possible and would not constitute material evidence (People v Stark, 73 Mich App 332; State v Teare, 135 NJ Super 19; State v Watson, 48 Ohio App 2d 110).
Still other States have rejected suppression on the grounds that no due process issues are involved. “A reexamination of the ampoules, if technically feasible, would fall short of producing evidence which could be characterized as material to the issue of guilt or innocence” (Edwards v State, 544 P2d 60, 64 [Okla]; see, also, State v Canaday, 90 Wn 2d 808; State v Helmer, 278 NW2d 808 [SD Supreme Ct]).
The latter approach is exemplified by the court in People v Amidon (102 Misc 2d 850). In Amidon the City Court of Geneva held that due process rights of a defendant who has taken a breathalyzer test are adequately protected, provided that the principles enumerated in People v Donaldson (36 AD2d 37) are followed. These principles include the introduction of evidence for the jury’s consideration concerning the qualification of the officer who administered the test; proof that the breathalyzer apparatus was properly calibrated; proof that the chemicals used in the test were of the proper kind and mixed in the correct proportion; and proof that the test had been administered in accordance with the rules and regulations of the State Police Department. (People v Donaldson, supra, at pp 40-41.) The Amidon court held that assuming, arguendo, that the test ampoules could be properly preserved without deterioration, discovery of the ampoules “would add nothing material to the facts already before the jury(People v Amidon, supra, at p 852; emphasis added.)
*344 In my view the results of breathalyzer tests are clearly material to guilt or innocence, and are not merely “evidentiary” in nature. Under current New York law a blood alcohol reading of .1 of 1% by weight is not merely evidence of driving while intoxicated (presumptive or otherwise). If a jury finds that the defendant drove with a .1% blood alcohol content conviction is mandated. (Vehicle and Traffic Law, § 1192, subd 2.) Clearly a defendant should have the right to contest a result which automatically establishes guilt. Minimally, a defendant who has timely demanded a test ampoule for independent analysis should be entitled to a charge that a jury could consider the failure to preserve the evidence on the issue of reasonable doubt.
However that position only makes sense if accurate retesting is scientifically possible.
In that regard two New York courts have, comme d’habitude, come to different conclusions.
RICHTER AND LE FREE
Defendant Santiago principally relies on the Nassau County case of People v Richter (102 Misc 2d 285). In Richter, the People called as an expert witness a detective from the Nassau County Police Department. Herbert Gold-stein, a chemist with a bachelor’s degree, testified on behalf of the defense. Goldstein testified that it was possible to preserve the original test ampoule. He hypothesized (pp 288-289) that this would entail placing the ampoule in a dark plastic container “while in a glove box, with air drawn out * * * causing a small vacuum, or under a blanket of nitrogen * * * which would help force normal air out, and have no effect on the material. A teflon cover properly secured on the container would sufficiently seal it and preserve the contents of the ampoule for up to one year.” The People’s expert had no significant objections to that method. The Richter court, crediting Goldstein’s testimony, decided that it was possible to preserve the original test ampoule for scientifically accurate reanalysis. Citing authority from other jurisdictions, Richter held (p 295) that “[sjince the ampoules * * * are material to the very test which the People seek to use to prove the guilt of the defendant; and there is scientific proof that such ampoules *345 may be properly preserved to permit laboratory tests which might disprove the reliability and results of the breathalyzer test; and such proof might be favorable , to the defendant; such ampoules are material and necessary to the defendant’s defense.” The court concluded that police destruction of the ampoules used in breathalyzer tests necessitates suppression of the results of the test.
In direct contradiction to the Richter holding is the opinion of the City Court of Rochester in People v Le Pree (105 Misc 2d 1066). The defendant’s expert in Le Pree was Grant Pike, a chemical engineer, and the People’s expert was Dr. Kurt Dubowski, an expert in clinical and forensic chemistry and toxicology. The former testified that he had preserved ampoules with organic compounds in a solution identical to that found in a breathalyzer, and he believed that one would be able to run later tests on the preserved ampoules so as to obtain a scientifically valid reading of the original solution content of the ampoule. Pike admitted, however, that he had not conducted tests to verify his theory of preservation with breath test ampoules. The People’s expert, Dr. Dubowski, testified that he had already performed detailed experiments on the theoretical methods of preservation of breath ampoules proposed by Mr. Pike, the results of which indicated that none of the suggested methods worked well enough to yield scientifically valid data from which the contents of the breath ampoule at the time of the original test could, at a later date, be ascertained. In contrast to the Richter decision, the court in Le Pree was influenced by the testimony of the People’s witness and held that the Brady and Bryant principles of due process are not undermined by the prosecution’s failure to preserve the test ampoule. In that court’s view (p 1071), “[a]t the present time, subsequent retesting or chemical analysis of the test ampoules, no matter how preserved, provides no acceptable scientific relationship to the accuracy or validity of the original test results”.
THE EXPERTS’ SHOWDOWN
The conflicting results in Richter and Le Pree clearly reflect that case law in this area throughout the country has hinged on the acceptance or rejection of expert witnesses. At the hearing before me the “winning experts” in *346 Richter and Le Pree were called by their respective protagonists.
Dr. Kurt Dubowski, whose opinion was accepted by the court in People v Le Pree (supra) testified on behalf of the People. Mr. Herbert Goldstein, whose testimony favorably influenced the court in People v Richter (supra) appeared on behalf of defendant Santiago.
Comparing the curriculum vitae of these witnesses, I initially note that the credentials of Dr. Dubowski seem far more extensive than those of Mr. Goldstein. The latter holds a bachelor’s degree in chemistry, whereas the former holds a doctorate degree, is a diplómate of the American Board of Clinical Chemistry, and is a diplómate of the American Board of Forensic Toxicology. In addition, Dr. Dubowski has authored or coauthored in excess of 100 articles, a large number of which discuss the results of extensive research which he had conducted in the area of breath-alcohol analysis and preservation of ampoules. He is world renowned in this field.
This disparity of expertise however, cannot in and of itself, automatically render the more renowned witness’ theory acceptable and the other’s incredible. The history of science is replete with those who may be termed “tinkerers” who have ultimately proved highly respected experts to be incorrect. For example, Thomas Edison is a classic example of an American tinkerer who, without academic credentials, dramatically altered scientific theory. In the same vein, Charles Darwin’s theory of evolution, which was scoffed at by the “experts” of his era, is widely accepted today. Therefore, I emphasize that existence of Dr. Dubowski’s impressive academic and clinical achievements, while relevant, does not, by itself, render his testimony more credible than that of Mr. Goldstein.
During the October 2 suppression hearing, both experts agreed that the Smith and Wesson Model 900 A breathalyzer machine when properly operated, accurately measures a subject’s blood alcohol concentration. The apparatus operates in the following manner. The subject produces a long exhalation, and his breath is gathered in the machine and is caused to pass through a solution which *347 changes in color in proportion to the amount of alcohol present. Specifically, a measured volume of the last portion of the individual’s exhalation (alveolar air) is forced through a reagent solution (a sulfuric acid solution of potassium dichromate and chromic sulfate). The breathalyzer photometrically measures the change of bluelight transmittancy of the solution, and produces a calculated reading of the subject’s blood alcohol percentage. (People v Donaldson, supra, at p 39; Jones and Volpe, Storage Properties of Breathalyzer Test Ampoules, Journal of Studies on Alcohol, vol 40, No. 11.) As a general rule, any slight error in the operation of the breathalyzer, due to operator fault or mechanical defect will generate lower, rather than higher reading of blood alcohol percentage. (People v Donaldson, supra, at p 40.)
At the suppression hearing, Dr. Dubowski testified that he had performed numerous experiments in order to ascertain, with scientific certainty, whether the original test ampoule could be preserved. During these experiments, he attempted to preserve the original ampoule at room temperature with ordinary air, at cold temperature with ordinary air, at cold temperature with nitrogen, and at room temperature with nitrogen. His results were, at best, inconclusive. Dubowski testified that, although preservation of the test ampoule could best be attained under conditions of ordinary air and cold temperature, no scientifically consistent results were manifested which would demonstrate that the breath ampoules could be preserved to achieve accurate reanalysis. In his opinion, the present state of the art cannot prevent unpredictable changes in the contents of used breathalyzer ampoules by any of the techniques of preservation or combinations thereof. Dr. Dubowski believes that changes over time in the test ampoule prevent scientifically valid and forensically acceptable conclusions to be reached regarding the accuracy of the original breathalyzer test results. In sum, it was Dr. Dubowski’s position that no scientifically valid procedure exists for preservation of the breathalyzer ampoule.
In contrast, Mr. Goldstein testified that, in his opinion, the test ampoules could be preserved for reanalysis under certain controlled conditions. However, he candidly admit *348 ted that he had never actually attempted such preservation.
THE EXPERIMENT
Confronted with these opposing viewpoints at the suppression hearing, this court proposed the following experiment. Three volunteers from the New York County District Attorney’s office would consume varying amounts of alcohol. Each subject’s blood alcohol concentration would then be measured in court, using the breathalyzer machine described above. The results of this test would be known only to the machine operator and to the court. Mr. Gold-stein would be given the opportunity to preserve the test ampoules under any conditions he chose and would be able to reanalyze these ampoules at any future time which he deemed appropriate.
Mr. Goldstein accepted this challenge. He stated that he would preserve the test ampoules under conditions of ordinary air and cold temperature and that he would reanalyze them. Under the ground rules indicated the three volunteers from the District Attorney’s office “blew” the following reading:
Subject No. 1 0.12(5) BAC
Subject No. 2 0.00(0) BAC (no alcohol consumed)
Subject No. 3 0.05(0) BAC
BAC = Blood Alcohol Concentration
Mr. Goldstein took the three test ampoules and stored them in black 35 millimeter film canisters. For the first few hours, the ampoules were stored in a cooler with ice packs at 40 degrees Fahrenheit. They were then stored in a refrigerator at 20 degrees Fahrenheit until the morning eight days later. On that day, Mr. Goldstein submitted the ampoules to an independent laboratory at St. John’s University for reanalysis. When the ampoules reached room temperature, they were retested. The following results were obtained:
Subject No. 1 .177 BAC
Subject No. 2 .075 BAC
Subject No. 3 .102 BAC
*349 Significantly, in every instance, the ampoule reanalysis conducted by the defense expert’s own chemist yielded a higher reading than that which was obtained during the in-court examination of the test ampoules. This phenomenon existed even with respect to subject No. 2, who upon reanalysis, was measured as having .075 BAG but who, in fact, had consumed no alcohol at all.
Given these results, it is clear that defendant Santiago has failed to demonstrate that the breathalyzer machine, concededly reliable when operated properly can produce ampoules which are capable of being reanalyzed accurately at a later date.[2] Under present methods of preservation, the data obtained from retesting the original ampoule does not constitute scientifically reliable evidence from which the accuracy or validity of the original breathalyzer test can be measured. Reanalysis of the test ampoule does not produce material evidence which could raise a reasonable doubt as to defendant’s guilt. Therefore, I find that neither the due process nor fundamental fairness impose upon the prosecution the duty of preserving the test ampoule for subsequent retesting by the defendant. Accordingly, defendant Santiago’s motion to suppress the prosecution expert’s testimony regarding the results of the breathalyzer test administered to the defendant is denied.

. Cf. People v Kitt (86 AD2d 465), where a manslaughter conviction was reversed because of the failure of the People to disclose the results of a laboratory test on the deceased’s coat. The Appellate Division ordered a new trial since the test results had the possibility of assisting the defendant and raising a reasonable doubt. Of course, if the evidence (such as heroin) is consumed during the original analysis, there is no due process violation in admitting the test results. (Lee v State, 511 P2d 1076 [Alaska].)

. There are many theories to account for these results. Chemicals other than alcohol could react latently with the potassium dichromate. Effects of time, light and storage are unpredictable. In Dr. Dubowski’s experiments at the University of Oklahoma, retesting at later dates sometimes showed higher readings, lower readings, or close readings in an unpredictable pattern.