[No. 48571-2. En Banc. February 24, 1983.]

THE STATE OF WASHINGTON, *Respondent,* v. MAURICE VASTER, *Petitioner.*

*Michael J. Trickey* of *Eastside Defender Association,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Chris Quinn–Brintnall, Deputy,* for respondent.

STAFFORD, J.—Petitioner Maurice Vaster appeals from his convictions for first degree rape and first degree robbery

while armed with a deadly weapon. The Court of Appeals affirmed his convictions, rejecting petitioner's contention that the inadvertent destruction of a seminal fluid sample violated his due process rights. We affirm the Court of Appeals.

Petitioner waived his right to a jury trial and submitted his case to the court on stipulated facts. The trial judge found him guilty of raping and robbing a 19–year–old woman. The crime is described in the trial court's unchallenged findings of fact as follows:

Shortly after 7 a.m. on 31 December 1979, [the victim] was standing on the corner of Renton Avenue South and South Norfolk waiting for a bus. She was not a regular bus rider; her car was not operating. She observed a turquoise blue Toyota or Datsun drive by her on Renton Avenue South and turn onto South Norfolk. She saw the driver's face as he drove by. The driver then joined her at the bus stop. There was a street light at the bus stop. She described him as a black male, age 26–27, about 5'6" to 5'7", weighing 160 lbs., having a medium, stocky build, 2–inch Afro, brown eyes, and a mustache, wearing blue jeans, navy blue sweater, a navy blue watchcap and a dark brown, leather, waist–length coat. She looked at him and spoke to him when he came up to the bus stop. She then looked at a schedule posted at the bus stop, and realized she had missed the bus and that another bus would not be coming for about 30 minutes. She looked at him again and said that apparently they had missed the bus. He nodded and stretched as if he were sleepy. She began walking East on South Norfolk to her home. About 50 feet from the corner the man grabbed her from behind, held a small revolver to her head, and asked if she had any money. She gave him her purse, which contained about $37. She saw the man's face again at this time, and saw and felt the revolver. She asked the man several times not to hurt her. He told her, "don't say another word or I'll shoot you." He kept his left arm around her and held the revolver to her head with his right hand as he forced her to walk up into the front yard at 5531 South Norfolk. He forced her to take off her coat and lie down on her back. She saw his face again at that time. He made her pull her skirt up over her face and he

put her coat over her face. He pulled off her pantyhose and underpants, then had sexual intercourse with her. During this time he was still holding the revolver, and she held the barrel of it with her hand to keep it away from her head. He then told her to wait five minutes, and he left. Her purse and money were gone. Finding of fact 1.

Immediately after the rape, the victim returned home and called the police. After giving the police a detailed description of her assailant and his car, the victim was taken to the Harborview Medical Center. As is usually done in sexual assault cases, a fluid sample was taken from the victim's vagina. Laboratory analysis of the sample confirmed the presence of sperm.

Petitioner was arrested on January 6, 1980, for outstanding traffic warrants. At the time of his arrest he was driving a turquoise blue Datsun. He also was wearing a dark brown, waist–length leather jacket and matched the victim's physical description given the previous week.

The next day the victim was asked to attend a lineup. According to the undisputed findings of fact, she recognized the petitioner immediately. Although she was accompanied by police officers, she was fearful when she recognized petitioner. All seven men in the lineup were asked to repeat "Don't say another word or I'll shoot you." The victim recognized petitioner's voice when he spoke those words. She positively identified petitioner as the man who robbed and raped her on December 31, 1979.

At this juncture it should be noted that this remarkably detailed description, as well as the lineup identification, was made by a victim who, according to the unchallenged findings of fact, "attended schools . . . with many black students. She works and socializes regularly with black people. She sees black people as individuals." Finding of fact 4.

In accordance with a recently established procedure, on January 3, 1980, officials at Harborview Medical Center sent a letter to the Seattle Police Department's Sexual

Assault Unit informing them that, unless notified to the contrary, 20 vaginal fluid samples, including the victim's, would be discarded on February 4, 1980. Because this particular case had been assigned to the Robbery Unit, the Sexual Assault staff did not recognize the victim's name and thus did not request preservation of the sample. The Robbery Unit detectives who interviewed the victim upon her release from the hospital were not aware the sample had been taken or of its potential materiality as evidence. Thus, the sample was destroyed. The trial court found, however, that the loss of the vaginal fluid was inadvertent and that it had not occurred as a result of bad faith by the police department.

On March 13, 1980, the day before trial was scheduled to begin, petitioner requested that a secretor test be done on the vaginal fluid sample. He was informed the sample had been destroyed more than a month earlier. Petitioner then moved to dismiss the charges due to destruction of material evidence which he asserts had a possibility of creating a reasonable doubt about his guilt.

According to expert testimony presented by petitioner in support of his motion to dismiss, only about 80 percent of the population secretes their blood type in other body fluids, such as saliva, semen and vaginal fluid. Typing tests conducted on both the petitioner and the victim revealed him to be a type O secretor and her to be a type A secretor. A secretor will always secrete type O in addition to his or her own blood type. Thus, the victim revealed both A and O blood types in her sample whereas petitioner showed only type O.

A blood type testing of seminal fluids will show whether a particular person matches the profile of the seminal donor. The test cannot positively determine, however, whether a particular person in fact was the actual donor. *See* Boyce & McCloskey, *Legal Application of Standard Laboratory Tests for the Identification of Seminal Fluid,* 7 J. Contemp. L. 1 (1982). Thus, if the true assailant were a type B or AB secretor, a test of the victim's vaginal fluid

sample would establish that someone other than the petitioner must have been the assailant.[1] The presence of type A or O, however, would show only that petitioner was of the same profile as the true assailant. It would not establish that he actually had been the assailant.

Approximately 15 percent of the population is type B or AB, while types A and O make up the remaining 85 percent. The probability of any fluid sample showing a type B or AB secretion is 14 to 15 percent or less. Given the 80 percent chance that the true assailant is a secretor, the actual probability that the secretor typing test of the vaginal fluid would tend to exonerate petitioner drops nearer to 12 percent.

After hearing expert testimony regarding the science of type matching seminal fluid, the trial court denied the motion. Petitioner waived a jury trial and presented his case to the court on stipulated facts. The court found him guilty on both counts as well as two other counts of rape and robbery stemming from a separate incident.[2] He was sentenced to serve concurrent life terms for three of the four counts and 10 years on the fourth.

Petitioner appeals from the trial court's denial of his motion to dismiss. The Court of Appeals affirmed, reasoning that the destroyed evidence was not sufficiently material to warrant dismissal. The sole issue presented for review is whether petitioner's due process rights were violated by the inadvertent destruction of the vaginal fluid sample in this prosecution for rape.

---

[1]Although the State intimated to the contrary in oral argument, the record supports petitioner's contention that, if properly preserved, a sample can be tested up to 6 months after it was taken.

The validity of the test may, however, be affected by other factors such as the cleanliness of the victim, the use of a douche, consensual sexual intercourse within 24 hours before the rape, or bacterial infection. Without knowledge of these factors it is impossible to state with any degree of certainty that a test revealing AB or B blood type would actually exonerate petitioner.

[2]The petitioner appeals only from the two convictions arising out of this particular incident. The other two convictions were not appealed.

## I

The duty of the State to preserve material evidence is derived from the duty to disclose exculpatory evidence. *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). The *Brady* Court adopted a materiality test holding that due process requires a state to disclose evidence when it is material to the issue of guilt or innocence. In *United States v. Agurs,* 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976), the Supreme Court applied the *Brady* rule to three distinct suppression situations. First, where prosecutorial misconduct is involved, a conviction must be set aside if there is any "reasonable likelihood" that the undisclosed testimony could have affected the jury's decision. *Agurs,* at 103. Second, if the defense has made a pretrial request for specific evidence, the test focuses on whether the suppressed evidence "might have affected the outcome". *Agurs,* at 104. The last situation is one in which a general "*Brady*" request has been made or no request has been made at all. The duty to disclose evidence in such a situation arises only if the evidence "creates a reasonable doubt that did not otherwise exist". *Agurs,* at 112.

In *State v. Wright,* 87 Wn.2d 783, 557 P.2d 1 (1976), we extended the application of the duty to preserve material evidence to governmental loss or destruction of such evidence. "'[If the constitutional duty to disclose applied] only when the exact content of non–disclosed materials was known, the disclosure duty would be an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal.'" *Wright,* at 788 (quoting *United States v. Bryant,* 439 F.2d 642, 648 (D.C. Cir. 1971)). We nevertheless acknowledged in *Wright* that cases involving the loss or destruction of material evidence pose a significantly different problem than the traditional nondisclosure cases in which the suppressed evidence is still in existence.

Where evidence has been lost or destroyed, its actual materiality may be difficult if not impossible to ascertain. Indeed, in the instant case, we can only speculate whether

the lost vaginal fluid sample would have been material to the issue of guilt or innocence. Its actual relevance can never be ascertained. *See generally* Comment, *Judicial Response to Government Loss or Destruction of Evidence,* 39 U. Chi. L. Rev. 542 (1972).

Faced with the destruction of several items found at the scene of the murder for which the defendant was charged, the *Wright* court adopted a test for determining whether the destruction abridged the defendant's right to a fair trial. Unlike other jurisdictions which have focused on the good or bad faith of the prosecution in destroying the evidence,[3] we preferred to adopt the second *Agurs* standard and look to the *reasonable possibility* that the destroyed evidence was material and favorable to the defendant. *See Wright,* at 792. Using that standard, we found that because the destroyed evidence constituted the totality of the direct evidence in the case, defendant was left unable to contradict what was completely circumstantial evidence against him. Thus, there was at least a "reasonable possibility" that forensic analysis of the destroyed evidence would have exonerated the defendant.

Petitioner urges us to invoke the *Wright* standard and hold there was a "reasonable possibility" that the destroyed fluid sample would have been material to his defense. He argues that had the fluid sample contained AB or B blood type in the secretion, he would have been able to argue convincingly that he was not the true assailant.

The State, on the other hand, asks us to limit *Wright* to its unique facts and follow instead the more rigid standard adopted in two recent decisions of this court. *State v. Can-*

---

[3]*See, e.g., United States v. Augenblick,* 393 U.S. 348, 21 L. Ed. 2d 537, 89 S. Ct. 528 (1969) (where evidence not intentionally suppressed, its disappearance was excused). In rejecting the good faith/bad faith approach, the court in *State v. Wright,* 87 Wn.2d 783, 557 P.2d 1 (1976) relied on the rationale posited in *United States v. Bryant,* 439 F.2d 642 (D.C. Cir. 1971). Although the *Bryant* court focused on the circumstances surrounding the loss, the court held that if the procedures for preserving material evidence are inadequate, sanctions should be imposed even when evidence is lost despite good faith. *Bryant,* at 652.

*aday,* 90 Wn.2d 808, 585 P.2d 1185 (1978); *State v. Gilcrist,* 91 Wn.2d 603, 590 P.2d 809 (1979).

*Canaday* involved the destruction of used ampoules from a Breathalyzer test. It was urged that they could have been retested to impeach the validity of the original test. The California Supreme Court found a due process violation in a similar challenge. *People v. Hitch,* 12 Cal. 3d 641, 527 P.2d 361, 117 Cal. Rptr. 9 (1974). This court, however, held the used Breathalyzer ampoules were not material in a constitutional sense because the testimony to be gained from their use was only tangential to the question of guilt or innocence.[4] In so holding, we relied on the third *Agurs* standard: "constitutional error is committed by nondisclosure only if the evidence creates a reasonable doubt which did not otherwise exist." *Canaday,* at 815.

The facts of *Gilcrist* are particularly analogous to the situation present in the instant case. In *Gilcrist,* appellant sought dismissal due to the loss of a hair sample taken from the wall of a prison cell where an inmate stabbing occurred. As with the fluid sample in this case, the hair sample could not identify a particular person as the assailant. Unlike *Gilcrist,* however, a showing of dissimilarity in the fluid sample analysis would conclusively exonerate petitioner. The *Gilcrist* court held that because the missing evidence was not necessary for a prima facie defense, and would only affect the question of innocence circumstantially, appellant's due process rights were not violated. *Gilcrist,* at 609. Relying on *Gilcrist,* the Court of Appeals in the instant case held the fluid sample could have yielded results only circumstantial to the question of innocence. Thus, its loss

---

[4]We note parenthetically that a recent New York case casts further doubt on the validity of the controversial California decision in *People v. Hitch,* 12 Cal. 3d 641, 527 P.2d 361, 117 Cal. Rptr. 9 (1974). *People v. Santiago,* 116 Misc. 2d 340, 455 N.Y.S.2d 511 (1982). Based on an experiment conducted by expert witnesses, the *Santiago* court found that used Breathalyzer ampoules could not be retested with any degree of reliability. Thus, "neither the due process nor fundamental fairness impose upon the prosecution the duty of preserving the test ampoule . . ." 116 Misc. 2d at 349.

did not deny petitioner his due process rights.

Respondent's argument is based on the premise that mere speculation about the exculpatory nature of missing evidence is not enough to show materiality in a constitutional sense. Respondent interprets *Canaday* and *Gilcrist* to stand for the proposition that the defendant must show that the evidence would actually exculpate him.

■ The *Canaday–Gilcrist* line of analysis places a heavy burden on a defendant to prove the exculpability of the lost evidence. If the evidence no longer exists, there is often no way for a defendant to ascertain the true extent of its exculpatory nature. We are also aware, however, of the heavy burden *Wright* imposes on the prosecution to preserve all potentially material evidence. We therefore find it necessary to adopt a reasonable balance for those cases in which there has been an inadvertent or good faith loss or destruction of evidence.

In weighing the burdens necessarily imposed on both the defendant and the prosecution, a court should first consider whether there exists a *reasonable possibility* that the missing evidence would have affected the defendant's ability to present a defense. The burden of establishing that "reasonable possibility" rests with the defendant. "Reasonableness" must be determined in light of the peculiar circumstance of each case. Lost or destroyed evidence which does not rise to the level of establishing a "reasonable possibility" that it will exculpate a defendant will be deemed insufficiently material to constitute a due process violation.

Next, the court must balance the consideration of "reasonableness" against the ability of the prosecution to have preserved the evidence. Further, in determining the appropriate sanction, a court should consider procedures established for preserving evidence, the nature of the lost evidence, and the circumstances surrounding its loss. *See* Note, *Criminal Procedure—Preservation of Due Process When Evidence Is Destroyed or Tested—State v. Wright,* 53 Wash. L. Rev. 573 (1978).

## II

In applying the foregoing test to the instant case, we note at the outset that both California and Nevada have held the destruction of a semen sample denied an accused the right to due process of law. *People v. Nation,* 26 Cal. 3d 169, 604 P.2d 1051, 161 Cal. Rptr. 299 (1980); *Crockett v. State,* 95 Nev. 859, 603 P.2d 1078 (1979). While the rationale of these cases appears persuasive, we note with interest that in both cases other evidence against the defendants was relatively weak. In the present case, we have a strong detailed initial description, a defendant whose person, dress and automobile matched that detailed description, and a strong lineup and voice identification by the victim. This greatly decreases the possibility that the evidence in question would have exonerated petitioner.

In adopting a balancing approach we also consider the duty to preserve evidence. We are aware of the potential difficulties posed when lost or destroyed evidence has never been in the control or possession of the prosecution. Such was the case here. We nevertheless hold the duty to preserve applies not only to the prosecution but to its agents acting under prosecutorial authority. *See Wright,* at 793. This includes the police as well as private citizens acting under their authority. While the police in this case did not have physical control over the vaginal sample, they were given the authority to request its preservation. Their silence indicated permission, albeit unintentional, that the sample be destroyed.

We now turn to a determination of whether there is a "reasonable possibility" that destruction of the vaginal fluid sample would have materially affected the issue of guilt or innocence. We find that standing alone, a 12 percent probability that any fluid sample could be exculpatory might in some cases be a "reasonable possibility". Here, however, there is extremely strong evidence of guilt. In light of the unusually detailed eyewitness identification in this case plus the exact match–up between the petitioner and the original description, we are not inclined to find that a "rea-

sonable possibility" exists. We do not excuse the loss of the vaginal sample; however, we believe that its loss in this case did not abridge petitioner's due process right to a fair trial.

The petitioner also presented several assignments of error in his pro se supplemental brief. While there are few facts on the record with which to evaluate these contentions, we find them to be without merit.

The decision of the Court of Appeals is affirmed.

WILLIAMS, C.J., UTTER, BRACHTENBACH, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.