[No. 5585-0-III. Division Three. July 26, 1984.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM HUXOLL, *Appellant.*

*Aaron Horowitz,* for appellant (appointed counsel for appeal).

*Arthur R. Eggers, Prosecuting Attorney,* and *Thomas E. Cooney, Jr., Deputy,* for respondent.

GREEN, J.—William Huxoll appeals from a jury verdict finding him guilty of rape and indecent liberties. He assigns error to the court denying his motions to suppress a confession and to dismiss the rape charge because of the State's failure to save vaginal fluid samples taken from the victim after the rape. He also claims the evidence was insufficient to convict him of indecent liberties. We affirm.

On March 11, 1982, a Walla Walla school counselor over-

heard the victim reporting to her mother over the telephone that she had been raped that morning by defendant, who was living with them at that time. The counselor contacted the police, who took the victim to St. Mary's Hospital. The hospital obtained her clothes, hair samples and a vaginal washing.

On April 2, after several requests by Barbara Lloid, the investigating officer, defendant voluntarily came to the police station and gave a statement to Officer Thomas Luty. In that statement, he admitted to facts which would constitute rape.[1] Thereafter, on September 8, he was charged by amended information with two counts of statutory rape; one occurring on March 11, 1982, and a second occurring in May 1981. He was further charged with one count of indecent liberties occurring between September 1979 and September 1980.

Prior to trial, defendant moved to suppress the statement made to Officer Luty. He testified he went to the station in response to telephone calls from Officer Lloid asking him to "come here to tell my part of the story." He stated he spoke with about 10 attorneys before going to the police station who told him not to sign anything. He testified he

---

[1]The confession states in part: "The biggest [sic] part of the story started approximately 11 months ago. [Complainant] fell in love with me, and I fell partiall[y] in love with her. She went to her mother and told her that we have shared everything in our lives and I think we should share Bill. [She] was 14½ years old and she wanted to go to bed with me, and I refused. I did consent to play with her, I fondled her breasts and her vagina, I stuck my fingers into her vagina. She never touched me. . . .

". . . The night befor[e] she stated that I made love to her, I wired the window and the next morning the wires were broken and I think that she sneeked [sic] out and got her self [sic] made love to in order to set me up. That morning she got up and I was still in bed, she was acting differently, not doing her normal routine. She came to the bed room [sic] door and I told her to come on in, she sat on the edge of the bed, and I pulled her to a position on the bed next to me and we talked about some school problems. I put my arm around her and kissed her as I have befor[e], on the lips, I started fond[ling] her, playing with her breasts. I took her underpants off and she spread her legs and she wanted sex and I would not go. I reach[ed] down between her legs and fingered her vagina and discovered that the hole was much larger than it usually was."

was not given any *Miranda*[2] warnings and was informed any statement he gave would not be used in court.

Officer Luty testified he was unaware of the victim's report when defendant entered the station, but after contacting Officer Lloid, who was not present at that time, was informed defendant was involved in a child molestation case. He testified before he talked to defendant he advised him of *Miranda* warnings which included the fact that defendant was entitled to an attorney and anything he said could be used against him in court. Defendant responded he understood his rights and had already talked with his attorney. He did not request an attorney at any time.

It is undisputed Officer Luty typed defendant's statement as he spoke. Defendant crossed off inaccuracies and initialed them; however, he refused to sign the statement on the basis "he had said more than his attorney had advised him to say anyway." Officer Luty then requested another officer, Ronald Gilbreath, to witness the refusal to sign. Defendant then left the station.

On this evidence, the court found in favor of the officer's testimony that *Miranda* warnings were given and that the confession was voluntary. It was further found the statement was not a result of custodial interrogation. Defendant claims the court's determination was error.

We do not reach the question of whether defendant's confession resulted from custodial interrogation requiring *Miranda* warnings since the court found those warnings were given. Defendant argues the State did not sufficiently prove that fact because the prosecutor did not call Officer Gilbreath to testify, citing *State v. Davis,* 73 Wn.2d 271, 438 P.2d 185 (1968). That case holds corroborative testimony must be produced when the constitutionality of a confession is challenged if such testimony is shown to exist and is pertinent to whether the accused received *Miranda* warnings. *See also State v. Erho,* 77

---

[2]*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

Wn.2d 553, 463 P.2d 779 (1970). A lack of such testimony is not fatal, however, to the State's case where it does not exist. *State v. Robbins,* 15 Wn. App. 108, 112, 547 P.2d 288 (1976).

Here, Officer Luty testified Officer Gilbreath was present "off and on" when defendant gave his statement, "However, I think, that he merely witnessed that the subject refused to sign the statement." Defendant testified when Officer Luty finished typing the statement,

> he said, "Are you going to sign it?" I said, "No." He says, "Okay." He says, "I'll get the guy over here that just came in and sat down—he was taking a statement too for somebody else at the desk right next to him—and get him to witness it." And that's all there was to it.

There was no evidence Officer Gilbreath was present when defendant began his statement to Officer Luty, the relevant time for determining whether *Miranda* warnings were given. The officer could have testified only to the fact defendant refused to sign the confession—a fact which was not disputed. Under the rule established in *Davis,* the testimony, being merely cumulative of a fact not in issue, would not be required. The court could therefore properly resolve the issue on the testimony presented.

Second, defendant contends the court should have dismissed the March 11 rape charge because the State failed to produce a portion of a vaginal fluid sample taken from the victim at St. Mary's Hospital. The record shows the hospital's normal procedure was to obtain approximately 500 microliters of vaginal fluid and use about 270 microliters in testing. A colorimetric test was performed on the sample obtained here which showed the presence of prostatic acid phosphatase, a male secretion. A second test produced negative results for the existence of sperm. Also as a routine procedure, the fluid remaining in the vial after testing was put in a lock box to be given to the police.

Prior to trial, defendant sought to obtain a portion of the sample taken in order to perform additional tests but was informed by Joseph Gorski, the state criminologist, that no

vaginal washings were received. Defendant then moved to dismiss the March 11 rape charge. The court denied the motion at the close of the evidence.

Defendant's assertion the court's ruling is error is based on *State v. Vaster*, 99 Wn.2d 44, 659 P.2d 528 (1983). That case held the prosecution has a duty to preserve evidence where there is a reasonable possibility that it would affect the defendant's ability to present a defense. *See also State v. Wright*, 87 Wn.2d 783, 557 P.2d 1 (1976). Defendant maintains such a showing was made here. At trial he denied having intercourse with the victim and suggested someone else had done so on the basis she "was sneaking out the bedroom at night." Expert testimony showed the colorimetric test performed at the hospital was not dependable for determining the existence of prostatic acid phosphatase, and other tests were available which would more accurately identify the presence of the substance. The record further shows the victim's panties were also obtained at the hospital. They were initially examined and found to evidence no sperm. Mr. Gorski, on a second examination, did find sperm; however, the panties had not been sufficiently preserved to perform enzyme tests, which produce results similar to blood typing. Defendant asserts further testing could have exculpated him. Therefore, he urges that *Vaster* dictates reversal here.

The rule in *Vaster* does not apply here for two reasons. First, in that case police remained silent after being informed by hospital staff that vaginal fluid samples, including one from the victim, would be destroyed. The court held the duty of preserving the evidence applied to both the prosecution and its agents acting under prosecutorial authority. It went on to state at page 53:

> While the police in this case did not have physical control over the vaginal sample, they were given the authority to request its preservation. Their silence indicated permission, albeit unintentional, that the sample be destroyed.

Here, unlike *Vaster*, there is no evidence the State had an

opportunity to save any portion of the fluid sample. The record shows the amount of sample taken was estimated by visual observation; the amount used was not written down but was determined by "normal protocol"; only a few drops routinely remained after testing; while the remaining fluid was routinely saved, the hospital did not guarantee and there was no way of determining whether any fluid would be left over after the tests. Thus, the evidence shows the hospital, without prosecutorial authority, either used the entire sample in testing or lost it.

Second, whether a reasonable possibility exists the missing evidence will be exculpatory must be determined by reviewing the entire record, including evidence of guilt as well as other evidence of the defense. *State v. Wright, supra* at 789–90. Here, as in *Vaster,* because the sample was unavailable for further testing, there is no way of knowing its actual materiality. On the other hand, this is not a case involving merely circumstantial evidence; nor was there any evidence other than defendant's conjecture to support his claim that the victim had sexual intercourse with anyone else. *See State v. Wright, supra.* On the other hand, there is strong evidence of guilt, the strongest of which is defendant's admission to facts which would constitute rape of the victim. Additionally, the victim's mother, who testified for the defense, stated she "may have" told a Department of Social and Health Services (DSHS) worker that defendant admitted to raping the victim and that "she ha[d] been asking for it . . ." The DSHS worker testified the mother told her defendant raped the victim. The victim's account of the incident was basically the same as defendant's up to the act which constituted the rape; the remainder of her testimony concerning prior incidents was corroborated both by her mother and by the DSHS worker; and pubic hairs combed from the victim matched those belonging to defendant. Finally, defendant was allowed extensive cross examination and presented evidence concerning the reliability of the testing procedure. Based on the entire record, we do not find his right to a fair trial was

abridged. *See State v. Vaster, supra* at 54. We therefore conclude there was no error in denying his motion to dismiss.

 Finally, defendant contends the evidence was insufficient to convict him of indecent liberties under RCW 9A.44.100(1)(b)[3] because the victim's testimony was ambivalent about whether she was less than 14 years of age at the time of the incident. Although the victim was uncertain about her age, she testified in detail to the circumstances surrounding the incident which, taken together with her mother's testimony, would enable the fact finder to conclude she was under 14 years old at the time of the subject offense. Therefore this contention must fail. *State v. Ferguson,* 100 Wn.2d 131, 139–40, 667 P.2d 68 (1983).

Affirmed.

MUNSON, C.J., and THOMPSON, J., concur.

Review denied by Supreme Court October 19, 1984.

---

[3] "(1) A person is guilty of indecent liberties when he knowingly causes another person who is not his spouse to have sexual contact with him or another: . . .

"(b) When the other person is less than fourteen years of age; . . ."