[No. 17045-7-I.   Division One.   August 4, 1986.]

THE CITY OF SEATTLE, *Petitioner*, v. JAMES K. DUNCAN, *Respondent.*

*Douglas N. Jewett, City Attorney,* and *Will Roarty, Assistant,* for petitioner.

*Marilyn Young–Skogland* of *Seattle–King County Public Defender Association,* for respondent.

RINGOLD, A.C.J.—The City of Seattle appeals the Superior Court's reversal and dismissal of a municipal court conviction of property destruction. We granted discretionary review and reverse.

On August 2, 1984, at approximately 3 p.m. Donald Sankus was leaving the parking lot of a service station in his vehicle. His car stalled on the sidewalk of the driveway and protruded onto Highway 99. At the same time, a truck driven by James Duncan turned onto Highway 99 and proceeded at a high rate of speed. Upon seeing Sankus' car protruding onto the highway, Duncan applied his brakes in an attempt to avoid Sankus. Duncan skidded for about 10 feet. From this point, the testimony of Sankus and Duncan

differs.

Sankus maintains that as he attempted to start his car to move it back into the service station lot, Duncan jumped from his truck and ran to the driver's side of Sankus' car. Duncan kicked the driver's side door twice leaving a footprint shaped dent in Sankus' car door. Duncan then ran back to his truck and left. After examining the damage, Sankus went into the service station and telephoned the police.

Duncan, on the other hand, testified that after getting out of his truck, he ran toward Sankus' car and told him to "hold on" because he felt that the front hub of his vehicle had been damaged. When Duncan got close to the car, he could tell that Sankus was bigger than he and angry. Duncan further maintains that as he approached the car window, Sankus began swearing at him. He testified:

> A: He was calling . . . (unintelligible) . . . his face, he was reaching rather quickly, just about the time I got about three feet away. I said hold on, you ran into my axle. I was really upset. You know . . . I almost lost my truck there.
>
> Q: So what did you do?
>
> A: So when he started jumping out I put my foot up. The door hit my foot but not where the damage allegedly is. It was much closer to the handle . . . right under the handle.
>
> Q: Then what happened?
>
> A: I got back to my truck and got it out of traffic on Aurora. By that time more cars were coming.
>
> Q: Now why did you put your foot up?
>
> A: I thought I was going to get knocked over with the door. I pretty well figured this guy is going to punch me.

Duncan also testified that after returning to his truck he turned his truck into the service station parking lot. In the lot, he saw Sankus' car, but not Sankus. He wrote down Sankus' license number and went straight home and called 911. He contends that he reported the incident in "every detail" within 15 to 20 minutes of the confrontation. The police report, however, states that Duncan "called in to

report a traffic accident where the other driver displayed a hand gun" 1 hour 37 minutes after the incident.

Duncan was subsequently charged with property destruction for the door–denting incident.[1] Duncan moved for discovery of the 911 tape of his call. An order granting access to the tape was obtained. It was then discovered that the tape had been routinely destroyed prior to Duncan's discovery request. Duncan then moved to dismiss the charge alleging that the tape contained evidence supporting his assertion that he put his foot on the car door in selfdefense. He argued that destruction of such material and favorable evidence warranted dismissal. The motion was denied and Duncan was convicted as charged.

On appeal to the Superior Court the Municipal Court was reversed and the charge dismissed because of the destruction of the tape.

### DESTRUCTION OF EVIDENCE

The question before this court is whether the Superior Court correctly construed *State v. Vaster,* 99 Wn.2d 44, 659 P.2d 528 (1983).[2] Duncan contends that *Vaster* stands for the proposition that a prosecution must be dismissed if there is a reasonable possibility that the destroyed evidence affected the defendant's ability to present a defense. *Vaster,* at 52. Duncan maintains that if the tape had been preserved he could have established his defense without giving up his Fifth Amendment right to remain silent. He also asserts that the contents of the tape would have corroborated his testimony if he did choose to testify.

---

[1]Seattle Municipal Code 12A.08.020 provides:

"A. A person is guilty of property destruction if he intentionally damages the property of another.

"B. In any prosecution under subsection A, it is an affirmative defense that the actor reasonably believed that he had a lawful right to damage such property."

[2]The City of Seattle admits that it had the duty to preserve the 911 tape, *State v. Wright,* 87 Wn.2d 783, 790–91, 557 P.2d 1 (1976), and appeals solely on the premise that the Superior Court misapplied *State v. Vaster,* 99 Wn.2d 44, 659 P.2d 528 (1983). It is conceded that the tape was inadvertently erased.

The City argues that under *Vaster* a defendant must show that there exists a reasonable possibility that the destroyed evidence would exculpate the defendant before destruction of the evidence will constitute a due process violation. *Vaster,* at 52. The City contends that overwhelming evidence of guilt as well as the trial court's findings belie any contention that the tape recording had a reasonable possibility of exculpating Duncan.

In his decision to reverse Duncan's conviction, the superior court judge stated:

A due process violation occurred when the prosecution failed to preserve the 911 tapes in this case. Defendant was able to establish a *"reasonable possibility" that the evidence would be favorable and material* to the defense case. *See Vaster [supra]* . . .

(Italics ours.)

A proper interpretation of *Vaster* is dispositive of Duncan's case. It is particularly important since the arguments of the parties as well as the Superior Court's decision rely solely on various excerpted statements from the case taken out of context. Viewed in its entirety, however, *Vaster* supports the City's contention.

In *Vaster,* the court considered whether the inadvertent destruction of a rape victim's vaginal fluid sample violated the defendant's due process right. *Vaster,* at 48. The court adopted a balancing test to be applied in cases of inadvertent or good faith destruction of evidence. The court stated:

In weighing the burdens necessarily imposed on both the defendant and the prosecution, a court should first consider whether there exists a *reasonable possibility* that the missing evidence would have affected the defendant's ability to present a defense. The burden of establishing that "reasonable possibility" rests with the defendant. "Reasonableness" must be determined in light of the peculiar circumstance of each case. Lost or destroyed evidence which does not rise to the level of establishing a "reasonable possibility" that it will exculpate a defendant will be deemed insufficiently material to constitute a due process violation.

*Vaster,* at 52; *State v. Campbell,* 103 Wn.2d 1, 18–19, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094 (1985). Whether a reasonable possibility exists that the lost evidence would be "exculpatory must be determined by reviewing the entire record, including evidence of guilt as well as other evidence of the defense." *State v. Huxoll,* 38 Wn. App. 360, 366, 685 P.2d 628, *review denied,* 102 Wn.2d 1021 (1984); *accord, State v. Wright,* 87 Wn.2d 783, 789–90, 557 P.2d 1 (1976).

In *Vaster,* the court held that the destruction of the vaginal fluid sample did not materially affect the issue of guilt or innocence. The court stated that the 12 percent probability of the fluid sample being exculpatory might create a "reasonable possibility" in some cases. In light of the evidence presented, however, the court was unwilling to make such a finding.

The court noted that there was extremely strong evidence of Vaster's guilt including a detailed eyewitness identification and an exact "match–up" between Vaster and the original description given. *Vaster,* at 53. Under the circumstances, the court did not believe that the loss of the sample abridged Vaster's due process right to a fair trial. *Vaster,* at 54.

It is apparent that the mere fact that the evidence was material and potentially favorable to the defense was not enough for the *Vaster* court. It looked further to determine whether there was a reasonable possibility that the destroyed evidence would be exculpatory. In the case sub judice, the Superior Court reversed Duncan's conviction relying solely on the ground that there was a reasonable possibility that the evidence was material and favorable to Duncan. There is no indication that the court considered whether a reasonable possibility exists that the destroyed evidence would exculpate Duncan in light of all the other evidence presented. This is the analysis advocated by the City and required by *Vaster.* We, therefore, must determine whether the Superior Court's ruling should be sustained in light of all the evidence presented.

REASONABLE POSSIBILITY OF EXCULPATION

There are a number of cogent reasons for determining that there is not a reasonable possibility that the destroyed tape would exculpate Duncan.

First, after hearing all the testimony, the municipal court judge determined that the 911 call was placed by Duncan, not soon after the averted automobile accident, but rather after a later confrontation between Duncan and Sankus. Apparently, Sankus obtained Duncan's address after filing the police report. He then went to Duncan's house to obtain restitution for the damage. A confrontation ensued. As the trial court noted:

> I don't know if later there was some altercation between the two men that might have prompted him to call the police, call 911, or whatever to complain that he was in danger of being assaulted. But if I do find that if that did happen, it happened sometime after this incident occurred and was *not related to this particular aspect of their confrontation.*

(Italics ours.) In light of this finding, it is doubtful that the 911 call was relevant to the disposition of the door–kicking incident before the court.

Second, even if the 911 call was deemed relevant, it would be inadmissible. Contrary to Duncan's assertions, it is not admissible as a prior consistent statement pursuant to ER 801(d). The call was made after the door–kicking incident. Whether the call was placed 15 to 20 minutes or 1 hour 37 minutes after the incident, Duncan would, nonetheless, have a motive to fabricate at that time. *State v. Ellison,* 36 Wn. App. 564, 568–69, 676 P.2d 531 (1984). Likewise, it would not be admissible under the business records exception (RCW 5.45) if being offered to prove the truth of the matter asserted in the call. *State v. Ross,* 42 Wn. App. 806, 809, 714 P.2d 703 (1986). Nor would it likely be admissible as an excited utterance under ER 803(a)(2). *State v. Doe,* 105 Wn.2d 889, 892–93, 719 P.2d 554 (1986).

A tenable argument could be made that proof of the time of the incoming call would be probative, though tangential,

to the question of guilt or innocence. *State v. Canaday,* 90 Wn.2d 808, 817, 585 P.2d 1185 (1978). We note, however, that Duncan did not pursue other means of obtaining the records of the 911 call such as subpoenaing the logs or operators of the 911 system.

Third, Sankus' testimony was corroborated in detail by a disinterested witness who viewed the entire incident.

Last, the municipal court judge in her oral findings stated: "Even if I were to assume that he did call 911, that he did say that he was in an altercation and that he feared for his safety, with the testimony that I've heard today, I would have made the same finding."

We need not, therefore, speculate as to whether the 911 tape had a "reasonable possibility" of exculpating Duncan. On the contrary, the judge acting as trier of fact has informed this court that even if the tape was before her and contained the statements purported, her decision would have remained the same.

Under *State v. Vaster, supra,* it cannot be said that there is a reasonable possibility that the destroyed 911 tape would have exculpated Duncan. The 911 tape, therefore, is insufficiently material, and its destruction does not constitute a due process violation. *Vaster,* at 52; *State v. Campbell, supra* at 19.

ARTICLE 1, SECTION 3

As a corollary to his federal due process argument, Duncan urges this court to recognize that Const. art. 1, § 3[3] provides a higher degree of due process protection than afforded by the federal constitution relied upon in *Vaster. State v. Bartholomew,* 101 Wn.2d 631, 683 P.2d 1079 (1984). Accordingly, he contends that even if the reversal cannot be sustained under *Vaster,* it should be affirmed under the Washington State Constitution.

The language of Const. art. 1, § 3 is virtually identical to its federal counterpart, U.S. Const. amend. 14, § 1. This

---

[3]Const. art. 1, § 3 provides: "No person shall be deprived of life, liberty, or property, without due process of law."

fact, however, does not preclude a state from interpreting its constitutional provision more broadly. *Bartholomew,* at 639. Nonetheless, cases interpreting a similarly worded federal provision are entitled to great weight. *State v. Davis,* 38 Wn. App. 600, 604, 686 P.2d 1143 (1984).

■ Duncan provides no analytic basis for interpreting Const. art. 1, § 3 differently than its federal counterpart. He merely cites two cases in which our state constitutional provision was read more broadly. Both cases provided compelling rationales for such a departure.

In *Bartholomew,* the Supreme Court invoked article 1, section 3 as a means to reaffirm a judgment that was vacated by the United States Supreme Court. In its original decision, the court held that portions of the state capital punishment statute violated the Eighth and Fourteenth Amendments. *Bartholomew,* at 633. On remand, the court reaffirmed, relying solely on the state constitution for authority. *Bartholomew,* at 644. Duncan's case does not present a similar situation.

Duncan also cites *State v. Davis, supra,* in support of a broader interpretation of Const. art. 1, § 3. *Davis* was written in response to *Fletcher v. Weir,* 455 U.S. 603, 71 L. Ed. 2d 490, 102 S. Ct. 1309 (1982). *Fletcher* held that if *Miranda* warnings have not been given, the federal due process clause does not prohibit use of the defendant's post–arrest silence for impeachment purposes. In *Davis,* this court declined to follow *Fletcher* in construing Const. art. 1, § 3. Two reasons were posited: (1) the court determined that allowing use of post–arrest silence where *Miranda* warnings were not given would serve to penalize defendants who are knowledgeable of their rights; and (2) such a ruling would tend to discourage the reading of *Miranda* warnings in order "to preserve the opportunity to use the defendant's silence against him." *Davis,* at 605.

There are no similarly compelling reasons to depart from the due process analysis articulated in *Vaster.* If there is no "reasonable possibility" that the destroyed or lost evidence would exculpate the defendant, it cannot be said that such

a loss violated his right to due process. When the loss cannot be attributed to intentional actions of the State, it would be absurd to require dismissal if the lost evidence, though material and favorable to the defendant, would nonetheless have no effect on the verdict.

We reverse the superior court order of dismissal and affirm the municipal court judgment and sentence.

GROSSE and PEKELIS, JJ., concur.