OPINION OF THE COURT
Irving Lang, J.
Universally recognized as the most effective weapon in New York’s arsenal of statutes aimed at drunken drivers is subdivision 2 of section 1192 of the Vehicle and Traffic Law. That section provides, in relevant part: “No person shall operate a motor vehicle while he has .10 of 1 per centum or more by weight of alcohol in his blood as shown by chemical analysis of his blood, breath, urine or saliva”. (Vehicle and Traffic Law, § 1192, subd 2.)
In his motion to dismiss, defendant asserts that the legislation is unconstitutional. Defendant claims, in essence, that since subdivision 2 defines criminal behavior solely in terms of a mathematical measure of blood alcohol content, it fails to provide constitutionally adequate notice of its prohibition to prospective violators.
Given that the proscribed conduct at issue here is defined in exact, quantitative terms, the seminal question is not the traditional “void for vagueness” argument but in *103 reality whether subdivision 2 of section 1192 of the Vehicle and Traffic Law is, to paraphrase California’s highest court, void for preciseness. (Burg v Municipal Ct., 35 Cal 3d 257, 198 Cal Rptr 145.)
THE FACTS
On May 31, 1983, Officer Joseph Malley of the Manhattan North Intoxication Unit was conducting a roadblock at the Triborough Bridge. Every car passing the roadblock was stopped, and each driver was checked for overt indicia of intoxication. At approximately 12:55 a.m., defendant Earle Schmidt was stopped and ordered to exit his vehicle. The officer noticed that the defendant was unsteady on his feet, his eyes were bloodshot, and his breath smelled of alcohol.
Defendant Schmidt was arrested and was administered a breathalyzer test. The test results indicated that defendant’s blood alcohol content was .10 of 1%. Defendant was subsequently charged with violating subdivision 2 of section 1192.
FACTUAL BACKGROUND AND LEGISLATIVE RESPONSE
Traffic deaths in the United States exceed 50,000 annually. Of the fatalities on the nation’s highways, approximately one half are alcohol related. {Burg v Municipal Ct., 35 Cal 3d, at pp_-_, 198 Cal Rptr, at p 146, citing US Dept of Transp, 1977 Highway Safety Act Report, Appendix A-9, table A-l.) The Supreme Court has observed that “[t]he increasing slaughter on our highways * * * now reaches the astounding figures only heard of on the battlefield.” (Breithaupt v Abram, 352 US 432, 439.) Specifically, in New York State alone, there were 1,947 fatal accidents in 1982. Alcohol was an apparent contributing factor in 785 of those deaths. (NY Dept of Motor Vehicles, Summary of Motor Vehicle Accidents, MV-144A.)
The Legislature’s response to this growing problem has been to increase the penalties for operating a motor vehicle while under the influence of alcohol and to make convictions easier to obtain.[1] {People v Molina, 121 Misc 2d 483; L 1981, ch 910, § 4.)
*104 Driving while intoxicated was first classified as an offense in the laws of New York in 1910.[2] Convictions under that statute were based solely on the defendant’s conduct and demeanor at the time of arrest. (People v Cruz, 48 NY2d 419.) The statute did not define “intoxication” or “operation of a motor vehicle”. Its focus was on punishment; a first offense was treated as a misdemeanor and the second as a felony. The Appellate Division, in 1910, interpreted the prohibition against driving while intoxicated to mean “that one shall not be affected by alcoholic beverage to such an extent as to impair his judgment or his ability to operate an automobile.” (People v Weaver, 188 App Div 395, 400.)
The next statutory modification came in 1926 when a new felony was created — causing serious bodily injury to another while driving in an intoxicated condition.[3] This was followed in 1929, by the repeal of the 1910 statute and the enactment of subdivision 5 of section 70.[4] The felony/ misdemeanor distinction was retained and the major difference between the two provisions involved license suspension and revocation. Under the earlier statute, suspension and revocation were discretionary, whereas the later statute mandated revocation if the driver was convicted of driving while intoxicated.[5]
In 1939, the National Safety Council Committee on tests for intoxication reported on the relationship between blood alcohol content and intoxication. The Committee established three “zones of influence” — (1) any person having up to .05% of alcohol in the blood was considered not to be under the influence of alcohol; (2) any person having .05% and less than .15% of alcohol in the blood was considered to be possibly under the influence of alcohol; (3) any person having .15% or more of alcohol in the blood was presumed to be under the influence of alcohol. The American Medical Association officially adopted this classification scheme. (1 *105 Erwin, Defense of Drunk Driving Cases [3d ed], § 14.02 [2], pp 14-6 - 14-7.)
In 1941 the New York Legislature allowed test results indicating blood alcohol content (hereinafter BAG) to be admitted at trial.[6] It was at this point in the evolution of the drunk driving statute that the Legislature attempted to define intoxication in scientific, mathematical terms. Specifically, a finding that a driver had .05 of 1% or less by weight of alcohol in his blood was admissible as prima facie evidence of no intoxication. A test result indicating more than .05 but less than .15 of 1% BAG was considered relevant evidence of intoxication. A BAG of .15 or above was deemed prima facie evidence of intoxication.
In the postwar period, the incidence of motor vehicle accidents and fatalities received national attention. The existence of blood alcohol evidentiary provisions and license revocation penalties did not serve as an adequate deterrent.[7] In 1953, the New York State Joint Legislative Committee on Motor Vehicle Problems took the position that observational testimony of the indicia of intoxication was inaccurate and unpersuasive before a jury. The scientific blood alcohol content test was viewed as producing a more reliable type of evidence. Thus, in July, 1953, apparently acting on this assumption, section 71-a of the New York Vehicle and Traffic Law was passed by the Legislature. This provision stated that any person driving a vehicle in New York State implicitly consents to a BAG test, administered at the direction of an officer who has reasonable grounds to suspect that the driver is intoxicated. If the driver refused to submit to such test, the Commissioner of Motor Vehicles was obligated to revoke the driver’s license or permit.[8]
*106 Shortly after its enactment, section 71-a was successfully challenged on due process grounds.[9] The constitutional infirmity was twofold: (1) the statute did not require a valid arrest as a basis for the officer’s demand that the driver submit to a BAG test; and (2) a license could be revoked without a hearing. The Legislature responded, in 1954, by amending section 71-a to provide the following: (1) the police officer needed reasonable grounds to believe (as opposed to reasonable grounds to suspect) that the driver was intoxicated; (2) an arrest had to precede the request to submit to the chemical test; and (3) the accused had to be granted an opportunity to be heard before revocation of a license or permit.[10]
Despite the new laws, the problems increased and the concerns of the Legislature were more pronounced. Under the auspices of the Temporary State Commission on Coordination of State Activities, the Vehicle and Traffic Law was recodified. The evidentiary weight to be given BAG measurements remained unchanged.[11] Soon after the new Vehicle and Traffic Law took effect, the American Medical Association, in November of 1960, adopted a policy that .10% should be considered prima facie evidence of being under the influence of alcohol. (1 Erwin, Defense of Drunk Driving Cases, § 14.02, p 14-13.)
Within the first year of its enactment, the New York Legislature added a new classification of proscribed conduct to section 1192 — the traffic infraction of driving while impaired. Blood alcohol content of .10 of 1% was deemed evidence of impairment.[12] Originally, impairment could only be established by scientific proof showing a specific blood alcohol content. (People v Bronzino, 25 AD2d 685.) This requirement was subsequently eliminated. (L 1970, ch 275.)[13]
*107 In 1970, the Legislature undertook a major revision of section 1192 and enacted the general format in effect today.[14] The proscription against driving while ability was impaired by alcohol remained a traffic infraction. Operation of a motor vehicle while in an intoxicated condition was classified as a misdemeanor. The evidentiary significance of BAC levels (contained in a new section — section 1195) was as follows:
.05 BAC or less — prima facie evidence of no impairment, and no intoxication;
more than .05 and less than .10 —prima facie evidence of no intoxication; relevant evidence of impairment.
.05 or more for driver under 21 — prima facie impairment (repealed, see n 17);
.10 or more — prima facie evidence of impairment; relevant evidence of intoxication.[15]
Finally, and most importantly, the 1970 Legislature enacted an absolute liability provision. It substituted the former presumption of intoxication with the per se crime of driving with a certain percentage of alcohol in the blood. Specifically, the 1970 statute stated that it was a misdemeanor to drive with a BAC of .15.[16] That provision was the direct forerunner of the present subdivision 2 of section 1192.
In 1971, the Legislature lowered the prima facie standards for intoxication and impairment. Replacing the .15 BAC level, it established .12 of 1% by weight of alcohol in the blood as the baseline standard of intoxication.[17] The Legislature also lowered the BAC levels admissible as evidence of intoxication or impairment:
more than .05 and less than .08 — prima facie evidence of no intoxication; relevant evidence of impairment;
*108 .08 or more — prima facie evidence of impairment; relevant evidence of intoxication.[18]
Aware of the view advocated by the National Highway Safety Bureau,[19] and adopted by an increasing number of States, that the liability level of blood alcohol content should be still lower, the New York Legislature finally acquiesced in 1972. Subdivision 2 of section 1192 was revised to its present form, which establishes a per se crime if a person operates a motor vehicle with a blood alcohol content of .10. In addition, the BAG levels admissible as evidence of impairment and intoxication were simultaneously modified:
.05 or less — prima facie evidence that the operator is not impaired or intoxicated;
more than .07 but less than .10 — prima facie evidence that the driver is not intoxicated; prima facie evidence of impairment.[20]
In 1974, a final provision was enacted stating that more than .04 of 1%, but not more than .07 of 1% BAG, is prima facie evidence of no intoxication, but is relevant evidence of impairment.[21] These are the quantitative standards in effect today.
The statutory development set forth above reveals a gradual but deliberate attempt on the part of the Legislature to fortify the effectiveness of the drunk driving laws. The culmination of this effort — the enactment of a .10 per se liability standard — reflects a determination that when a defendant drives with that amount of alcohol in his blood, the question of guilt need not be defined by his subjective behavior and condition. Rather, what is required is that the People prove, by objective, scientific criteria that at the time defendant was driving, his BAG was .10%.[22]
*109 Is this precise, quantitative standard void for “vagueness,” as defendant urges?
VAGUENESS AND PRECISENESS
It is a primary requirement of due process that a criminal statute be stated in terms which are reasonably definite, so that a person of ordinary intelligence will know what the law prohibits or commands. (People v Cruz, 48 NY2d 419; United States v Petrillo, 332 US 1, 6.) “The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.” (United States v Harriss, 347 US 612, 617.) A criminal statute must survive scrutiny under a two-pronged test in order that it comport with due process requirements: (1) the statute must give adequate notice to prospective violators; and (2) the statute must provide an objective standard by which violations may be adjudged after they have occurred. (People v Smith, 44 NY2d 613, 618.) Regarding the first prong, the Court of Appeals recognized that “a criminal statute must be informative on its face * * * and so explicit that ‘all men subject to their penalties may know what acts it is their duty to avoid’”. (People v Diaz, 4 NY2d 469, 470.) As Justice Holmes observed: “[although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.” (McBoyle v United States, 283 US 25, 27.) These guidelines allow a citizen to acquire adequate warning of what the law mandates, so that he may behave accordingly. In addition, they serve as “ ‘boundaries sufficiently distinct’ ” for police, Judges and juries to fairly administer the law in a nonarbitrary, nondiscriminatory manner. (People v Cruz, supra, at p 424; United States v Petrillo, 332 US 1, 7, supra.)
defendant’s arguments
Defendant concedes that subdivision 2 of section 1192 passes muster under the second prong of the due process *110 test since it embodies a clear, objective, mathematical standard by which violations are adjudged. However, when subdivision 2 of section 1192 is examined under the first prong, or “notice” portion of the vagueness test, he contends that a different result must be reached.
Defendant argues that since subdivision 2 of section 1192 bases liability on a purely quantitative, scientific standard, no ordinary member of society could be expected to know the percentage by weight of alcohol in his or her bloodstream at any given time.
Following this reasoning, this quantitative standard would operate as a trap, even in a situation where the driver himself is a mathematician or quantitative analyst. Since the focus of the law is solely on bodily condition based upon measurement, and, since the measurement is allegedly not a matter of common knowledge, defendant argues that no adequate warning is given of the proscription contained in the statute, thereby rendering it constitutionally infirm.

ALFARO

Defendant Schmidt’s position was enunciated by the California Court of Appeal in People v Alfaro (192 Cal Rptr 178 [reported in advance sheet only]). The Alfaro court held that subdivision (b) of section 23152 of the California Vehicle Code (which is identical in relevant part to Vehicle and Traffic Law, § 1192, subd 2) was unconstitutionally void for vagueness. It reasoned that the .10 absolute liability provision “gives notice that a particular percentage of alcohol in the blood of a driver is illegal, without further explication, notwithstanding that the measured concentration of alcohol in the blood is plainly not a matter of common understanding, as demonstrated by the fact that test results of clinically obtained specimens must be interpreted at trial by an expert witness” (People v Alfaro, supra, at p 181; emphasis in original). The Alfaro court based this observation partly on a study which indicated that calculation of BAG depends upon a number of factors, inter alia: the weight of the individual; the amount of alcohol ingested and in what form; the time elapsed since drinking commenced; the speed of absorption of alcohol in the blood; and the rate at which alcohol is dissipated from *111 the blood. (People v Alfaro, supra, at p 181, n 2 [citing Dubowski, Alcohol and Traffic Safety, US Dept HEW, Public Health Serv Pub No. 1043.) The fatal flaw in an absolute liability statute of this kind according to Alfaro, is that the .10 provision allows persons to drink and drive, but gives no reasonably ascertainable means of knowing when such conduct transforms into criminality. The Alfaro court concluded that the statute would “regularly produce convictions on such palpably unfair terms of notice, since the individual could only speculate as to how and when his blood-alcohol ratio would reach the criminal point.” (People v Alfaro, supra, at p 182.)
ANALYSIS
At least five States have examined claims of vagueness regarding similar .10% BAG statutes. In each instance, the constitutional attacks were rejected (Roberts v State, 329 So 2d 296 [Fla]; State v Franco, 96 Wn 2d 816; Greaves v State, 528 P2d 805 [Utah] [reversing lower court]; Van Brunt v State, 646 P2d 872 [Alaska]). In California, four appellate courts have analyzed the issue adversely to defendant’s claim. (Ostrow v Municipal Ct., 149 Cal App 3d 668; People v Lewis, 148 Cal App 3d 614; People v Woodard, 143 Cal App 3d 1; People v Lujan, 141 Cal App 3d Supp 15.)
Most recently, the Supreme Court of California, that State’s highest court, overruled the holding in Alfaro (supra). In Burg v Municipal Ct. (35 Cal 3d 257,198 Cal Rptr 145, supra) the California Supreme Court held that the .10 statute provided constitutionally adequate notice and was not void for vagueness.
The Burg court stated that due process does not mandate a type of notice which is “subjectively” verifiable according to the terms of the statute, at the moment before the alleged violation occurs. Due process only requires fair notice, such that prosecution does not “trap the innocent”. (Grayned v City of Rockford, 408 US 104, 108.) The court observed that an individual who drives a vehicle after having ingested the amount of alcohol needed to approach or meet the prohibited level is neither innocent, nor is he without fair warning. (Burg v Municipal Ct., 35 Cal 3d, at p _, 198 Cal Rptr, at p 153.) He is not innocent because, according to California law, well before he reaches the .10 *112 mark, he would be in jeopardy of violating the .05 BAG standard of driving under the influence. Similarly, such a driver would be impaired in many States (including, as the Burg court points out, New York, where BAG between .07-.10 is prima facie evidence of impairment [Vehicle and Traffic Law, § 1195, subd 2, par (c)]). Moreover, he is not without fair warning, according to the California Supreme Court, because “[t]he very fact that he has consumed a quantity of alcohol should notify a person of ordinary intelligence that he is in jeopardy of violating the statute * * * Considering * * * today’s heightened level of public awareness * * * we cannot believe that any person who drives after drinking would be unaware of the possibility that his blood alcohol level might equal or exceed the statutory standard.” {Burg v Municipal Ct., 35 Cal 3d, at pp _-_, 198 Cal Rptr, at pp 153-154.) The court concluded that “[i]f, in the exceptional case, a person experiencing the symptoms of alcohol ingestion failed to be aware of them, the most probable reason would be depression of the brain function caused by the alcohol itself. ‘Fair notice,’ * * * has not been interpreted as requiring the overcoming of such a self-induced obstacle.” (35 Cal 3d, at p_, 198 Cal Rptr, at p 154.)
I find the rationale of Burg and cases similarly decided more persuasive than Alfaro. The .10 absolute liability provision patently warns the drinking driver that his indulging must stop before his BAG exceeds the legally acceptable limit. The fact that subdivision 2 of section 1192 does not specify the precise number of drinks permissible, or the fact that a drinking driver might not be able to discern whether his BAG is .09, .10 or .11, does not invalidate the provision on vagueness grounds. The notice requirement is not so rigidly construed. The United States Supreme Court recently observed “due process has never been interpreted so strictly as to require ‘actual’ notice * * * at most, the cases require ‘fair notice.’ ” {Burg v Municipal Ct., 35 Cal. 3d, at p_, n 15, 198 Cal Rptr, at p 152, n 15 [citing Kolender v Lawson, 461 US 352, 357].)
Fair notice is provided by subdivision 2 of section 1192. A person who drinks any alcohol is accorded an unambiguous warning that in order to avoid potential criminal *113 behavior, he should refrain from driving within a relatively short span of time. There is “no reason why a person of ordinary intelligence would have any difficulty in understanding that if he has drunk anything containing alcohol, and particularly any substantial amount thereof, he should not attempt * * * to take control of a motor vehicle.” (Greaves v Utah, supra, at p 808.) The fact that the warning might become blurred in the mind of the driver after each glass he drinks is no measure of the statute’s validity. Subdivision 2 of section 1192 describes the violation with a reasonable degree of certainty, so that ordinary people can understand what conduct is prohibited. This is all that due process requires. (Burg v Municipal Ct., supra; United States v Harriss, 347 US 612, supra.) Any “Catch-22” situation which the driver finds himself in is entirely self-imposed. Even if it is true that, “the more he drinks, the less he knows,” the driver is given sufficient warning that the two activities cannot be mixed. Charts are readily available to the public which indicate, with a reasonable degree of certainty, the number of alcoholic beverages necessary for a particular individual to reach a BAG of .10%.[23] (State v Franco, 96 Wn 2d 816, 825; Burg v Municipal Ct., 35 Cal 3d, at p_, 198 Cal Rptr, at p 154.) Although it is possible that, even with the aid of a chart, an individual might estimate incorrectly and thereby violate the statute, this possibility does not render it invalid. “ ‘The law is full of instances where a man’s fate depends upon him estimating rightly’” {Burg v Municipal Ct., 35 Cal 3d, at p_., 198 Cal Rptr, at p 154, citing Nash v United States, 229 US 373, 377.) As the Supreme Court observed: “The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities.” {Morissette v United States, 342 US 246, 256.)
Nor is the liability standard of subdivision 2 of section 1192 absolutely unique in our jurisprudence. Section 1751 of the former Penal Law of New York provided liability for possession of a compound, substances or mixture containing 1% or more of the alkaloid of heroin. Obviously only a *114 chemist could make that measurement in a complicated scientific chemical analysis. Again, a person who steals a purse containing $10 from a counter commits petit larceny. If the purse contains a credit card, he commits grand larceny.
Once a person exposes himself to a zone of danger he cannot complain if the danger is greater than he expected — provided that it is reasonably foreseeable.
So it is with drinking and driving. A person who consumes an ordinary alcoholic beverage within an hour of driving is on notice that he is exposing himself to a zone of danger. If he takes more than one drink he is on notice that he is exposing himself to a zone of absolute liability. If he reaches to .10% legislative prohibition, he has only himself to blame.
CONCLUSION
I find that the .10 BAG limit is a standard that an ordinary person can understand. One need not be a mathematician or quantitative analyst in order to conform his behavior to the limit established in subdivision 2. Thus, the statute satisfies the fair notice requirement mandated by the due process clause. Accordingly, the defendant’s motion to dismiss the charge pursuant to subdivision 2 of section 1192 is denied.

. An exhaustive analysis of this topic may be found in King and Tipperman, The Offense of Driving While Intoxicated; The Development of Statutory and Case Law in New York, 3 Hofstra L Rev 541.

. Former Highway Law, § 290, subd 3, as added by L 1910, ch 374: “Punishment for operating motor vehicle while in an intoxicated condition * * * Whoever operates a motor vehicle while in an intoxicated condition shall be guilty of a misdemeanor * * * [I]f any person shall be convicted a second time *** he shall be guilty of a felony”.

. Former Highway Law, 8 290, subd 3, as amd by L 1926, ch 732, 8 1.

. Vehicle and Traffic Law, former 8 70, subd 5, as added by L 1929, ch 54.

. Vehicle and Traffic Law, former § 71, as added by L 1929, ch 54.

. L 1941, ch 726, § 1: “Upon the trial of any action or proceeding arising out of acts alleged to have been committed by any person arrested for operating a motor vehicle * * * while in an intoxicated condition, the court may admit evidence of the amount of alcohol in the defendant’s blood taken within two hours of the time of the arrest, as shown by a medical or chemical analysis of his breath, blood, urine, or saliva.”

. King and Tipperman, The Offense of Driving While Intoxicated: The Development of Statutory and Case Law in New York, 3 Hofstra L Rev 541, 549.

. L 1953, ch 854, § 1: “Any person who operates a motor vehicle or motor cycle in this state shall be deemed to have given his consent to a chemical test of his breath, blood, urine, or saliva for the purpose of determining the alcoholic content of his blood provided that such test is administered at the direction of a police officer having reasonable grounds to suspect such person of driving in an intoxicated condition. If such person refuses to submit to such chemical test, the test shall not be given but the *106 commissioner shall revoke his license or permit to drive”.

. Matter of Schutt v MacDuff, 205 Misc 43.

. L 1954, ch 320, 8 1, amdg Vehicle and Traffic Law, 8 71-a, as added by L 1953, ch 854, 8 1.

. Vehicle and Traffic Law, 8 1192, as added by L 1959, ch 775. Operating a motor vehicle while intoxicated was still classified as a misdemeanor; two such offenses constituted a felony. The implied consent provision was embodied in section 1194. Revocation and suspension provisions were found in section 510.

. L 1960, ch 184, 8 1, amdg Vehicle and Traffic Law, § 1192.

. In 1963, the Legislature focused upon the problem of minors (defined as persons under the age of 21) who drink and drive. Section 1192 was amended to provide that a *107 BAC of more than .05 was prima facie evidence of impairment for a minor driver. BAC of .15 or more continued to be prima facie evidence of intoxication for minor and adult drivers. (L 1963, ch 869, § 2.)
In 1966, section 1192 was revised to state that a driver who operates a motor vehicle while his ability is impaired by the use of drugs is guilty of a misdemeanor. (L 1966, ch 963, § 1, amdg Vehicle and Traffic Law, § 1192, subd 2.)

. Vehicle and Traffic Law, § 1192.

. Vehicle and Traffic Law, § 1195.

. Vehicle and Traffic Law, § 1192.

. L 1971, ch 495, § 1. In addition, separate BAC levels for minor drivers were eliminated.

. L 1971, ch 495, §§ 2, 4.

. King and Tipperman, The Offense of Driving While Intoxicated: The Development of Statutory and Case Law in New York, 3 Hofstra L Rev 541, 578, n 198.

. Vehicle and Traffic Law, § 1195, subd 2, par (b).

. Vehicle and Traffic Law, § 1195, subd 2, par (b). Former paragraph (b) was redesignated (c) by L 1974, ch 248, § 2.

. At the request of Congress, statutes of this kind have been enacted in 28 States and the District of Columbia. In addition, title 23 (§ 408, subd [e], par [1], cl [C]) of the United States Code makes enactment of .Í0% blood alcohol law mandatory for any State wishing to receive Federal highway funds to support alcohol traffic safety programs. (Burg v Municipal Ct., 35 Cal 3d_,_, 198 Cal Rptr 145, 148.) “Vision impairment begins at 0.03-0.08 percent (BAG) and becomes significant in all subjects at .10 percent; *109 reaction-time impairment begins at 0.04 percent; judgment of distance, dimensions and speed at 0.08 percent; coordination and memory at 0.10 percent” (Burg v Municipal Ct., 35 Cal 3d, at p —, 198 Cal Rptr, at p 151 [citing Oversight into Administration of State and Local Court Adjudication of Driving while Intoxicated; Hearings Before Subcom. on Courts of Sen. Comm, on the Judiciary, 97th Cong. 1st Sess (1981)]).

. It would be appropriate for the Legislature to require prominent posting of these charts in any premises where alcoholic beverages are sold or consumed.