## STATE OF FLORIDA v. PIGNONE

Case No. TO84-12778; TO84-12779

County Court, Orange County

June 6, 1984

### APPEARANCES OF COUNSEL

**Steve Foster,** Assistant State Attorney, for plaintiff.

**Stanton Cobb** for defendant.

## OPINION OF THE COURT

JANIS MARY HALKER, County Judge.

This cause is before the Court on the Defendant's Motion for Further Discovery/Protection of Breath Sample and Alternative Motion in Limine to Exclude Breath Testing Results." On May 1, 1984, the Court heard a full day of testimony and legal arguments and thereafter considered the decisions of numerous courts addressing the issues presented. The Court thanks and commends counsel for both parties for the able manner in which this case was presented. This high caliber of advocacy is greatly appreciated by the Court.

### FINDINGS OF FACT

On February 15, 1984, the Defendant was arrested by an Orange County Deputy Sheriff for Driving Under the Influence of Alcoholic Beverages, a violation of Fla. Stat. 316.193(1)(a) (1983). Following his arrest, defendant submitted, as required by law,[1] to a test of his breath to determine the alcohol content of his blood. According to the test results, defendant's blood alcohol level was .17 and he was thereupon charged with Driving With an Unlawful Blood Alcohol Level, (DUBAL), a violation of Fla. Stat. 316.193(1)(b) (1983).

Defendant provided his breath for analysis by blowing into a tube which had been inserted into an ampule in a Smith and Wesson 900A breathalyzer machine owned by the Orange County Sheriff's Department. As provided by law, this machine had been approved by the Department of Health and Rehabilitative Services for use in breath testing and on February 15, 1984 it was calibrated, maintained and operated according to HRS regulations and procedures. Basically, breath is analyzed by the machine after it reacts with the chemicals in the test ampule.[2] The breath is consumed by the test. It is possible, however, to collect and preserve for up to ninety days a separate sample of a defendant's breath for later analysis by using a device known as the Indium Crimper. The Indium Crimper has been approved for use in Florida by DHRS, and although it was designed to be used with a different type of breath testing machine, it can be adapted for use with the 900A Breathalyzer. The Indium Crimper preserves three samples of breath. As a matter of scientific methodology, in conducting an analysis of any organic substance it is preferable

---

[1] Fla. Stat. 316.1932 and 322.261. (1983).

[2] The technical explanation of how the machine operates and the scientific principles on which it is based are not material to the issues and would merely lengthen this opinion unnecessarily.

**199**

to test more than one sample of the substance. On February 15, 1984, the Orange County Sheriff's Department did not own an Indium Crimper or any other equipment capable of collecting and preserving a breath sample for later analysis.

The 900A Breathalyzer is not specific for alcohol. In other words, a properly working machine can produce an incorrect analysis of the alcoholic content of one's blood. For example, substances such as sugar crystals, paint thinner, formaldehyde vapor, lint and skin oil, to name a few, if accidently or intentionally introduced into the test ampule will react with the chemicals in the ampule and yield a reading which would be mistaken for blood alcohol content. The possible results range from a .01 for skin oil to .14 for sugar to .60 for ethylene glycol. The testimony fails to establish, however, that the possibility these substances could be introduced into the test ampule is anything but remote.

The best method of determining the alcoholic content of blood is a blood test. Under Florida law,[3] a defendant who has submitted to a breath test after arrest for DUI may, at his own expense, have a person of his choice administer a separate test. The defendant was not informed of this right. The breathalyzer is accurate at least 95% of the time as compared to blood tests. No clear testimony was presented as to the degree of inaccuracy involved in the other five percent of the tests.

## CONCLUSIONS OF LAW

### A. PREFACE

Nationwide, the suffering caused by drivers impaired by alcohol and other substances has produced legislation and law enforcement methods designed to facilitate the detection, prosecution and conviction of the intoxicated driver. As a result of these highly publicized measures, social attitudes are slowly changing in that what was once generally tolerated by society as normal conduct is now perceived as a serious threat to the safety of the community deserving of a higher priority in law enforcement than it occupied in the past. In turn, the significant increases in arrests for DUI is producing a steady stream of new legal challenges to each step of the prosecutorial process—from the initial stop of the suspected impaired driver to application of mandatory penalties—by defendants who face incarceration, fines and often the loss of the ability to make a living due to lengthy driver's license revocations. Currently, the Courts face not only burgeoning caseloads

---

[3] Fla. Stat. 316.1932(1)(f)(3) (1983).

200

but also the necessity of devoting more time in researching and deciding the many new issues being raised. But despite the caseloads and the great public concern over the problem of drunk driving, prosecutorial methods must comply with the Constitution and other applicable laws. The emotionalism attached to the issue must not be permitted to discourage the courts from careful consideration of each of defendant's legal challenges.

Against this background, and before addressing the legal issues in this case, a few observations concerning the appearance of prosecutorial fairness are appropriate. Many of the objections that are raised in traffic court result not from a violation of legal rights but a perceived violation as a result of something that occurred that produced the appearance of impropriety. Respect for the law is encouraged by the criminal justice system, that is not only fair but that is also perceived as fair. Although this court holds later in this opinion that the State is not legally required to collect and preserve a breath sample for a defendant charged with DUI, the court believes the benefits of doing so anyway would outweigh the minor inconvenience or cost involved.

First, the State should not be concerned that a subsequent analysis of the breath may in some cases show a different blood alcohol level. It is the jury's responsibility to decide guilt of innocence and to resolve conflicts in the evidence. The testimony in this case was that the breathalyzer is accurate in 95% of cases as compared to blood tests. Providing a defendant a separate breath sample would likely reduce the time required to be devoted to each DUI case for pre-trial motions attacking the validity of the results of the breathalyzer test.

Second, confidence of the accused and the public in the integrity of evidence gathering procedures would be fortified by preserving a separate sample. Science develops as a result of our innate need to know causes. Despite advances in science and technology and a willingness to accept new developments and theories, we maintain reservations, sometimes healthy, sometimes unfounded, about the accuracy and reliability of machines and scientific tests. While these tests are helpful to use in coping with the frustrating uncertainties of life, we remain cognizant of the many times throughout history that once widely embraced scientific principles have been later discarded as based upon assumptions proven to be false or for other reasons. Therefore, there is some comfort in the greater certainty a subsequent analysis of an accused's breath may provide.

Finally, collecting and preserving a separate breath sample would, in most cases, solve the problems entailed when the defendant requests an

independent test as allowed by law and must be transported to a facility for that purpose—usually late at night or in the early morning hours.

## B. *DUE PROCESS OF LAW*

The Fourteenth Amendment to the United States Constitution provides in part:

> . . . nor shall any State deprive any person of life, liberty, or property, without due process of law . . .

Similarly, Section 9 of Article I of the Constitution of the State of Florida provides in part:

> No person shall be deprived of life, liberty, or property without due process of law . . .

In our society, the phrase "due process of law" has come to connote a sometimes expanding, sometimes shrinking concept of the basic fairness and honesty we expect from government officials to whom we have entrusted the power to make decisions that affect our lives. Courts have struggled with this concept, case by case, in an effort to define "constitutional fairness" at a particular time under particular circumstances. One need only read a few of the myriad of decisions involving due process to recognize that this area of constitutional law is perhaps the most difficult to grasp and apply, possibly because motions of "fairness" vary so much from person to person. Normally, the function of the court in these cases is as a buffer between the citizen and the exercise of governmental power, seeking to strike a balance between the exercise of individual liberty and the furtherance of legitimate societal interests—resolving the inevitable clash between the expectations of the person and those of the community.

Although the contention that it is a violation of due process for the state to conduct a breath test without collecting a sample of breath from the defendant for his later testing is not new, there are no binding precedents in this state. In *State v. Lee,* 422 So.2d 76 (Fla. 2d DCA 1982), the due process issue was raised but not decided by the court for lack of a factual record establishing that a breath sample could be preserved for subsequent analysis. This issue has, however, been decided in a number of Florida trial courts, including two in this circuit.[4]

---

[4] *State v. Elder,* Case No. CR83-5759, Cir. Ct., Orange County, April 13, 1984; *State v. Brunk,* 3 Fla.Supp. 2d 75, Cty. Ct., Orange County, March 10, 1982; *State v. Littlefield, et al.,* 3 Fla.Supp. 2d 92, County Court, Palm Beach County, Nov. 14, 1983; *State v. Ernst, etc.,* County Court, Palm Beach County, Dec. 2, 1983; *State v.*

The Court has also had the benefit of decisions of other jurisdictions.[5] Currently this issue is pending a decision by the Supreme Court of the United States on certiorari review to the California Court of Appeals which decided *People v. Trombetta*, 190 Cal. Rptr. 319, 143 Cal. App. 3d 138 (1983), on which defendant relies. In *Trombetta,* the Court held that because the state is able to obtain and preserve the defendant's breath or its equivalent, due process requires that it do so or the results of the State's breath analysis must be excluded from the trial.

The Defendant's position is supported by the weight of the authorities and is gaining momentum. But the inquiry cannot end there, because this Court has the duty to independently determine the issue where there are no binding precedents. This Court is of the opinion that the decisions requiring collection and preservation of breath specimens are products of an erroneous application of existing law to the facts.

The assumption upon which *People v. Trombetta,* and similar decisions[6] are based is that the state, in conducting a breath analysis, during which the tested breath is necessarily consumed, has somehow "collected" evidence it had a duty to preserve. But since preservation of the tested breath is impossible because it is consumed in testing, how can it be said that the State has collected or seized possession of anything? It must be remembered that the breath can only be provided · by the defendant. The analysis of the breath by the machine certified in accordance with law to be reasonably reliable and accurate may.either incriminate or exonerate the defendant, particularly on the charge of DUBAL, which rests solely on whether the blood alcohol level was .10 or above. That *Trombetta* and other decisions incorrectly assume that the State has collected physical evidence is apparent from the requirement ultimately imposed on the State. Recognizing the impossibility of preserving that which the State does not possess, these courts require the State to routinely utilize a separate procedure to collect and

---

*Osborne,* County Court, Palm Beach County, Dec. 1, 1983; *State v. Martin,* 1 Fla.Supp. 2d 159, Cir.Ct., Hillsborough Cty., Nov. 30, 1981; *State v. Lindelof,* Case No. 09664-LH, Cty.Ct., Volusia Cty., April 18, 1984; *Cook, et al. v. State,* 2 Fla.Supp. 2d 184, Cir. Ct., Sarasota Cty., Feb. 26, 1981.

[5] *People v. Molina,* 468 NYS 2d 551 (N.Y.City Crim. Ct. 1983); *People v. Shepherd,* 460 NYS 2d 722 (Town Ct. 1983); *Garcia v. District Court 21st Jud. Dist.,* 589 P.2d 924 (Colo. 1979); *Baca v. Smith,* 604 P.2d 617 (Ariz. 1980); *Municipality of Anchorage v. Serrano,* 649 P.2d 256 (Alaska 1982); *People v. Miller,* 52 Cal. App. 3d 666, 125 Cal. Rptr. 341 (1975), *overruled People v. Trombetta,* 142 Cal. App. 3d 138, 190 Cal. Rptr. 319 (1983).

[6] See footnote 5 *supra*

preserve "the equivalent" of the breath consumed in testing, i.e., an encapsulated specimen. In Florida, it has been held there is no due process violation even where the State did have actual physical possession of evidence, if it was unavoidably consumed during testing. *State v. Herrera,* 365 So.2d 399 (Fla. 3rd DCA 1978), cert. denied, 373 So.2d 459 (Fla. 1979); *State v. Atkins,* 369 So.2d 389 (Fla. 2d DCA 1981). For this reason, defendant's reliance on *State v. Ritter,* — So.2d —, (Fla. 5th DCA 1983) 9 FLW 413, and *Johnson v. State,* 280 So.2d 673 (Fla. 1973) are misplaced. In both cases the State either negligently or without explanation lost physical evidence. Because of the factual differences, this Court should not interpret these decisions as requiring the State to gather particular evidence, especially where the State has employed a reasonably reliable procedure in breath testing. To do so would impose an unnecessary, unworkable, and burdensome duty on the state in many other areas to employ rapidly changing "state of the art" techniques in evidence collection and analysis.

Further, most of the decisions relied upon by defendant are based upon incorrect interpretations of the decisions in *Brady v. Maryland,* 373 U.S. 83 (1963) and *United States v. Bryant,* 439 F.2d 612 (D.C.Cir. 1971). The application of those decisions to render the State's failure to collect a breath sample a violation of due process creates a standard of due process greater than was intended, and imposes on the State a duty to provide more than a fair trial. It should be remembered, as stated in *McGautha v. California,* 402 U.S. 183, 221:

> [T]he Federal Constitution . . . does not guarantee trial procedures that are the best of all possible worlds, or that accord with the most enlightened ideas . . . or even those that measure up to the individual predelictions of members of the Court . . . The Constitution requires no more than that trials be fairly conducted . . . .

In *United States v. Bryant,* supra, the defendant had been convicted of the sale of heroin primarily on the testimony of an undercover agent of the Government regarding a conversation he had with the defendants a year before the trial. A tape recording of the conversation was made but the agent in charge of the taping took no steps to preserve the tape and it was lost. The undercover agent's notes of the conversation were "sketchy". In characterizing the case before it, the Court stated:

> It is important to recognize that this is not a case of good faith effort to preserve highly relevant evidence, frustrated only by inadvertent loss. Rather, it is a case of intentional non-preservation by an investigating official. 439 F.2d at 642.

204

The Court then held that once the Government has "gathered and taken possession of" evidence it has a duty to employ rigorous and systematic procedures to preserve it.

*Bryant* merely stands for the proposition that it is fundamentally unfair for the Government to create a piece of evidence, which could be crucial in the case and exonerate the accused and then carelessly lose or intentionally destroy it. Such action raises questions about the integrity of the investigative process, especially where, as in *Bryant,* the Government's case rested on testimony of the contents of the conversations that were taped. Yet even under *Bryant,* the mere loss of the evidence is not a *per se* due process violation mandating the exclusion of other evidence on which the lost evidence may have some bearing; there is a "good faith" exception where "earnest efforts" were made to preserve the evidence. See also *United States v. Augenblick,* 393 U.S. 348 (1969). Surely the *Bryant* court did not suggest that the Government had any duty to *make* a tape recording. Similarly, *Brady v. Maryland,* supra, dealt with the non-disclosure of evidence in *possession* of the State. The rule in *Brady* applies only where the State has *suppressed* evidence that might have affected the outcome of the trial. *United States v. Agurs,* 427 U.S. 97 (1976). This Court therefore holds that the State in this case has not suppressed evidence. Due process is satisfied by the systematic and rigorous procedures employed by the State in certifying, calibrating and maintaining the breathalyzer machine and in permitting the operators, by the availability of the machines for inspection, and the ability of the defendant, to request an independent test. That the Defendant was not told he could request an independent test is of no moment. The Court is unaware of any authority unless required by a statute, imposing a duty on prosecution authorities to instruct the accused as to particular statutory rights or privileges.

## C. RIGHT TO CONFRONT WITNESSES

The Sixth Amendment to the Constitution of the United States provides in part:

> In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.

Defendant argues that he has been denied his right of confrontation because without the benefit of a sample of his breath he cannot fully cross-examine the witnesses against him. No further discussion of this question is necessary because it has been held in decisions that are binding on the court that the Sixth Amendment right on confrontation

does not apply to physical evidence. *G.E.C. v. State,* 389 So.2d 325 (Fla. 5th DCA 1980); *State v. Armstrong,* 363 So.2d 38 (Fla. 2d DCA 1978); *State v. Atkins,* 369 So.2d 389 (Fla. 2d DCA 1979). Compare *Wisconsin v. Booth,* 295 NW 2d 194 (Ct. App. Wis. 1980).

It is therefore, ORDERED that the Defendant's Motion for Further discovery and Motion in Limine is DENIED.

The Court recognizes that the issues raised in this case are substantial and that this court's opinion appears to represent a minority view among the trial court decisions in this State. Further, in all likelihood, the question will be resolved in the next few weeks by the Supreme Court of the United States. Therefore, as to any pending cases in which the issues decided here have been properly raised, on appropriate written motion the Court will grant a stay of proceedings in those cases pending the Supreme Court's decision in *California v. Trombetta,* unless of course good cause is shown why a stay should not be granted.

## ORDER DENYING MOTION IN LIMINE

This cause is before the Court on the Defendant's Motion in Limine which asserts that the results of a breath test conducted following defendant's arrest for Driving Under the Influence, Fla.Stat. 316.193(1)(a) (1983) should be excluded.

During the monthly maintenance of the Smith and Wesson 900A Breathalyzer used in this case, a known stock solution of ethyl alcohol was introduced into the machine by use of a glass bottle device known as a Mark II Alcohol Breath Simulator. The Simulator has a thermometer and operates on electric power to heat the ethyl alcohol solution to the proper temperature, 34 degrees centigrade. The Simulator forces the vapor into the breathalyzer machine, which registers a reading of the alcohol content. The reading is checked against the known alcohol content of the stock solution to determine if the breathalyzer machine is in proper working order.

Fla. Admin. Code Rules 10D-42.23 requires that all chemical test instruments or devices "and allied equipment" be checked at least annually for accuracy and reproducability. Defendant contends that the Simulator is never examined or checked by anyone. This is true in the sense that no specific procedure has been developed and followed for examining the Simulator. But regardless of whether or not the Simulator is "allied equipment" within the meaning of the Rule, it appears that the Simulator is in fact tested at least monthly when it is used in performing the monthly maintenance checks on the breathalyzer. This constitutes compliance with the Rule.