[No. 6665–7–III. Division Three. July 31, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. STEPHEN
ROBINSON, *Appellant.*

*Dennis J. DeFelice,* for appellant.

*Curtis L. Ludwig, Prosecuting Attorney,* and *Andrew K. Miller* and *Darcy Scholts, Deputies,* for respondent.

MUNSON, J.—Stephen Robinson appeals his conviction for indecent liberties. He contends: (1) the victim's statements were inadmissible hearsay and their admission, after she was found unavailable because of stipulated incompetency, violated his right of confrontation; (2) he was prejudiced by the State failing to preserve exculpatory evidence; and, the court erred in (3) denying inquiry regarding prior false statements made by the victim's father (ER 608(b)); (4) not admitting evidence of his reputation for truth and veracity; (5) failing to instruct the jury that character evidence alone may create a reasonable doubt of guilt; and (6) allowing the prosecutor, in closing arguments, to make certain statements constituting prosecutorial misconduct. We affirm.

Around 1 p.m. on March 17, 1984, Mr. Robinson visited Randall McElroy at his home. During the course of the visit, he helped Mr. McElroy move his car and perused several of Mr. McElroy's adult magazines. Later, Mr. Robinson was invited to stay for dinner. After the two men drank some wine, Mr. McElroy left to pick up a pizza with his son, leaving his 3–year–old daughter alone with Mr. Robinson. He was gone approximately 10 to 15 minutes.

When Mr. McElroy returned, Mr. Robinson was in the bathroom; his daughter walked up to him, asking him to come and see what "Steve did to my blanket." Mr. McElroy claimed he saw what he believed to be an ejaculation stain on her blanket. He took the victim into the kitchen where she complained about pain and burning in her vaginal area. When he asked why, she said Steve had touched her there.

Mr. McElroy took her out to his car to question her more closely. He asked if she was making the story up; she replied "no." Although the light in the car was bad, he pulled her pants down to examine her. He believed she was a "little bit red on the buttocks area and on the vagina." He again asked if Mr. Robinson had touched her; she answered

"yes." He asked her how and she replied "[h]e made me lay down on the blanket and touched me with his tail."

When they returned to the house, the victim said something about feeling "bubbles coming out of her butt." Nothing was said to Mr. Robinson at that time and after eating the pizza, Mr. Robinson left. Mr. McElroy again examined the victim and again noticed redness near her vagina. He also noticed the odor of men's cologne on her.

Some 30 minutes later, Mr. McElroy drove to Mr. Robinson's house, confronting him. Mr. Robinson denied any sexual contact with the victim and suggested Mr. McElroy take her to the hospital.

At the hospital, the victim was first examined by Nurse Virginia Billings. Asked what happened, the victim explained that a man named Steve had put her on a blanket on the floor and asked her to lay down on her tummy. The nurse inquired where he had touched her; the victim pointed to her vaginal area. When asked what Mr. Robinson had touched her with, she responded "his finger." She stated further that "he had touched her with his tail and that soap had come out of his tail" and that it hurt very much when she went to the bathroom. Subsequently, she was interviewed by a police officer and related essentially the same facts.

Approximately 4 to 5 hours after the alleged incident, she was examined by Dr. Raymond Kania at the hospital. She again related the same story using the same language about "soap coming out of his tail." An examination of the victim revealed no evidence of penetration or physical injury. However, Dr. Kania was of the opinion sexual contact could have occurred without leaving any physical evidence.

The stain on the blanket was examined by Joseph Gorski of the Washington State Patrol Crime Lab, who determined it was human sperm. However, he was unable to phenotype the stain. He noted that if the blanket had been stored properly (it had been stored in the police property room for 2 months), that blood typing tests should have led

to positive results. He admitted, however, that even if the semen sample had been stored under optimum conditions (*i.e.,* refrigerated or frozen), there was only a 50 percent chance of blood typing after 2 months.

During pretrial hearings, both the defense and the prosecution, after interviewing the victim, stipulated that she was incompetent to testify. The trial court, without making an independent determination regarding the victim's competency, accepted the stipulation and ruled she was unavailable as a witness. Subsequently, the court ruled the victim's hearsay statements to her father, Nurse Billings, the police officer, and Dr. Kania were admissible under RCW 9A.44.120, the sexually abused child hearsay exception; alternatively, it held the victim's statements to her father admissible under ER 803(a)(2) as excited utterances and the statements to Dr. Kania admissible under ER 803(a)(4), the medical diagnosis or treatment exception. The court also ruled Mr. Robinson's right to confrontation was not violated by his inability to cross–examine the victim as the statements were reliable when made and corroborated by the semen stain on the blanket. Following a jury trial, Mr. Robinson was found guilty as charged on one count of indecent liberties; this appeal followed.

## ADMISSION OF VICTIM'S STATEMENTS

██ Mr. Robinson assigns error to the trial court's admission of the victim's statements to her father, Nurse Billings, Dr. Kania and the police officer; his challenge is twofold. First, he contends the statements constitute inadmissible hearsay. Second, he maintains his right to confront adverse witnesses was violated when the court determined the victim was unavailable, based on her stipulated incompetency before admitting her statements. ER 803(a)(2) permits the admission of a hearsay statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Although the statement must be made while the

declarant is still under the influence of the event, an excited utterance need not be contemporaneous to the event. *State v. Doe,* 105 Wn.2d 889, 893, 719 P.2d 554 (1986). Nor must an excited utterance be completely spontaneous; responses to questions may be admissible. *Johnston v. Ohls,* 76 Wn.2d 398, 406, 457 P.2d 194 (1969); *State v. Slider,* 38 Wn. App. 689, 692, 688 P.2d 538 (1984), *review denied,* 103 Wn.2d 1013 (1985). The fact the declarant is not competent to testify does not automatically prohibit the use of the hearsay statement as an excited utterance. *Johnston,* at 406.

■ Here, the statements made to Mr. McElroy immediately after returning with the pizza clearly fall within the excited utterance exception. Further, the victim's subsequent statements after the event are also admissible as excited utterances. Despite the fact some of her statements were in response to questioning, the danger of fabrication is remote given: (1) her tender age of 3; (2) a short lapse of time between the alleged act and the emergency room visit; (3) her continuing physical complaints at the emergency room; (4) the consistency of her story to the various witnesses; (5) her terminology in relating the story; and (6) no intervening influences militate against the reliability of the statements. Accordingly, all the statements may be properly admitted as excited utterances.[1] *State v. Woodward,* 32 Wn. App. 204, 206–07, 646 P.2d 135, *review denied,* 97 Wn.2d 1034 (1982); *State v. Bouchard,* 31 Wn. App. 381, 384–85, 639 P.2d 761, *review denied,* 97 Wn.2d 1021 (1982); *State v. Downey,* 27 Wn. App. 857, 861, 620 P.2d 539 (1980).

■ Nevertheless, the issue remains whether the trial court erred in admitting the statements, over Mr. Robinson's objections, that the testimony violated his right to confrontation guaranteed by the Sixth Amendment and

---

[1]The statements to Nurse Billings and Dr. Kania are also admissible as statements made for purposes of diagnosis and treatment. ER 803(a)(4).

article 1, section 22 (amendment 10) of our constitution.[2] Although a hearsay statement may be admissible under the rules of evidence, it may still violate the accused's right of confrontation. *California v. Green*, 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970); *State v. Guloy*, 104 Wn.2d 412, 424, 705 P.2d 1182 (1985), *cert. denied*, ___ U.S. ___, 89 L. Ed. 2d 321, 106 S. Ct. 1208 (1986). *State v. Ryan*, 103 Wn.2d 165, 170, 691 P.2d 197 (1984) (citing *Ohio v. Roberts*, 448 U.S. 56, 65, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980)) provides that hearsay admissions do not violate confrontation rights if: (1) the hearsay declarant is produced or demonstrated to be unavailable, and (2) the statements are demonstrated to be reliable. "'Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.'" *Ryan*, at 170 (quoting *Roberts*, at 66).

At the pretrial hearing, both the prosecutor *and defense counsel* stipulated the victim was incompetent to testify based on their interviews with her. The following colloquy took place between defense counsel and the court:

MR. DeFELICE: . . . Mr. Miller [the prosecutor] and I interviewed . . . who is the alleged victim in this incident. . . .

. . .

MR. DeFELICE: Based on that interview, it was, I think, both mine and Mr. Miller's conclusion, as well as Ruth Fabian's, who is the Department of Social and Health Services caseworker who's been working with this case, working with this girl because there's been a dependency matter involving Mr. McElroy and [the victim]—*so I think all three of us agree that she was not competent to stand trial.* . . .

THE COURT: *You mean she is not competent to testify?*

---

[2]Article 1, section 22 is worded differently than the Sixth Amendment and arguably gives broader protection. *See State v. Parris*, 98 Wn.2d 140, 154, 654 P.2d 77 (1982) (Williams, J., dissenting). Our courts, however, have not differentiated between their provisions.

MR. DEFELICE: I'm sorry, *not competent to testify in this matter.* I spoke with Mr. Miller earlier this week on this case, and I indicated I thought there should be a written stipulation prior to trial and even prior to this hearing, but certainly there should be something on the record to this court to find that she is incompetent. . . .

THE COURT: Mr. Needy, is the State willing to stipulate, as apparently Mr. DeFelice has asked, that she is *not competent to testify?*

MR. NEEDY: That's correct, your Honor. And if the Court so desires, we'll enter an appropriate order before trial.

THE COURT: Well, if counsel are in agreement that she is *not competent to testify,* then I would so rule.

(Italics ours.)

Neither party, however, contended she was incompetent at the time she made the statements to her father or the other witnesses. Mr. DeFelice indicated he was not attacking her competency at the time the statements were made when he stated "one of the grounds of unavailability as provided for in the Rules of Evidence, as well as by case law, is that the witness is not competent to testify. . . . I'm not contesting her competency."

Mr. Robinson contends that *Ryan* stands for the proposition that *stipulated* incompetency may never provide a sufficient basis for finding the victim unavailable to testify; we do not read *Ryan* so broadly. There, the stipulating parties *and* the trial court agreed the victims were unavailable while operating under "an erroneous understanding of statutory incompetency". *Ryan,* at 172. As a result, the trial court admitted the statements without determining whether the parties were stipulating that (a) the children were incompetent to receive just impressions and relate them truthfully at the time the statements were made, or (b) the children were merely testimonially incompetent at the time of trial.

Likewise, *State v. Doe, supra,* is distinguishable. There, the trial court excluded the child victim's statements after the State, alone, told the judge the child was incompetent

to testify; again, as in *Ryan,* the court made its decision to exclude while laboring under a misconception, *i.e.,* once a child is found incompetent to testify, statements made by the child are automatically too unreliable to be admitted. *Doe,* at 895–96.

 Here the stipulation was made only after the prosecution produced the victim and both the prosecution *and defense counsel* agreed she was unable to testify. The court accepted both counsels' representations in excusing her production at trial. *See Ryan,* at 172. Moreover, unlike *Ryan* or *Doe,* neither the court nor counsel misunderstood the basis for the stipulation, *i.e.,* she was incompetent to testify in a courtroom atmosphere, months after the incident. The record is equally clear that defense counsel failed to challenge the victim's inability to receive and relate "just impressions of the facts" at the time she made the statements. RCW 5.60.050(2). That the court understood the stipulation went to the victim's testimonial competency only is demonstrated by the following comments:

> THE COURT: . . . [T]he Court would find that the witness, of course, is unavailable as set forth in the statute by stipulation of Counsel; that she was not competent to testify in a court setting.
>
> Now, that's not to mean that the Court has found that she is an incompetent person. *The Court simply finds that based upon Counsel's stipulation and by no finding of this Court that she is incompetent as a witness,* except that Counsel have stipulated that she is. *Now, being incompetent to testify does not mean that she is not a necessarily reliable or a believable witness.* It seems to me that she is not of sufficient age and maturity to testify in court—in a formalized court setting and to, perhaps, understand—and I don't know this—perhaps not able to understand the penalties for not being truthful.

(Italics ours.)

Defense counsel did not object to the court's characterization of the stipulation indicating he agreed with the grounds for the stipulation. Therefore, we conclude, on these facts, that the prosecution met its burden of produc-

ing the declarant and under these circumstances incompetency is equivalent to unavailability. The court's determination of unavailability was not erroneous.

Given the victim's unavailability, the next issue is whether the statements were sufficiently reliable or trustworthy to be admitted. That the victim was incompetent to testify does not necessarily render her hearsay statements unreliable. *Doe,* at 896; *Ryan,* at 173–74; *State v. Frey,* 43 Wn. App. 605, 611 n.9, 718 P.2d 846 (1986) and cases cited therein. Because these statements fall within the "firmly rooted" excited utterance hearsay exception, the circumstantial guaranties of trustworthiness have been met; therefore, we conclude these statements are reliable and admissible as excited utterances notwithstanding Mr. Robinson's confrontation clause objection.

■ Assuming arguendo that the statements are not admissible as excited utterances, they would be admissible, as the trial court found, pursuant to RCW 9A.44.120, as statements of an "unavailable" child victim if they are reliable and corroborated. Since RCW 9A.44.120 is not a firmly rooted hearsay exception, reliability cannot be inferred; instead, "the time, content and circumstances" of the statements must be examined to determine their reliability, utilizing the factors set out in *State v. Parris,* 98 Wn.2d 140, 654 P.2d 77 (1982) and *Dutton v. Evans,* 400 U.S. 74, 88–89, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970); *Ryan,* at 170, 175–76.

Considering the *Parris* factors first, the child had no apparent motive to lie. Evidence of her character was not introduced. Remarkably similar statements were given to four different people on four separate occasions. Her statements were spontaneous; they were made while she was still suffering distress and pain from the event. Although some of the statements were in response to questions, the record reveals the questions were not leading. Finally, nothing in the timing of the statements reveals unreliability; she told her father immediately after he arrived home; nothing in the record indicates the father was predisposed to believe

Mr. Robinson had sexually abused his daughter prior to his daughter's statements.

Considering the *Dutton* factors, the statements were assertions of either present facts of the victim's discomfort or of facts which had occurred immediately prior to her making the statements. Cross examination could not have revealed her lack of knowledge. The possibility of her faulty recollection is remote given that the statements were consistent and the last one was given within 5 hours of the alleged incident. Finally, there is no reason to suppose the victim misrepresented Mr. Robinson's involvement.

Given our examination of these factors, we conclude the statements were reliable; they were also corroborated by the semen stain found on the blanket. We hold, therefore, that the statements were admissible pursuant to RCW 9A.44.120, if not as excited utterances.

### PRESERVATION OF EVIDENCE

■ Mr. Robinson contends the trial court erred in not granting his motion to dismiss on the basis that the State failed to properly preserve the stain on the blanket. In *State v. Vaster*, 99 Wn.2d 44, 52, 659 P.2d 528 (1983), the court held no due process violation occurs where no "reasonable possibility" exists that the lost or destroyed evidence would affect the defendant's ability to present a defense; the burden of establishing a "reasonable possibility" rests with the defendant.

Here, Mr. Robinson has failed to show the existence of a reasonable possibility that failure to type the stain affected his ability to present a defense. First, use of an "exculpatory" blood type was not an active part of his defense. Although his counsel learned that the State's expert had failed to blood type the sample prior to trial, no request was made to produce the sample so Mr. Robinson could conduct his own tests. More importantly, no evidence was presented demonstrating that the police *actually* stored the blanket in an improper manner; thus, there is little indication that police mishandling or improper storage was the

cause of Mr. Gorski's inability to type the stain. Such a conclusion is speculative given there was only a 50 percent chance of typing the stain after 2 months even under the best of circumstances.

Since other evidence exists, including: (1) the victim's statements; (2) the testimony that the blanket was washed the day before the incident; (3) the redness around the victim's vagina; and (4) the odor of men's cologne on the victim's body, we conclude the missing evidence would not present a reasonable possibility of exculpating Mr. Robinson. *State v. Huxoll,* 38 Wn. App. 360, 366, 685 P.2d 628, *review denied,* 102 Wn.2d 1021 (1984). We find no error.

### CHARACTER FOR TRUTHFULNESS

Mr. Robinson next contends, relying on *State v. York,* 28 Wn. App. 33, 621 P.2d 784 (1980), that the court erred in prohibiting inquiry into Mr. McElroy's "character for truthfulness" pursuant to ER 608(b) since his testimony was crucial to the State's case. In *York,* the testimony of an undercover drug agent was the only evidence presented against the defendant with respect to his alleged delivery of a controlled substance. The court did not allow the defense to inquire into the undercover agent's truthfulness as a witness pursuant to ER 608(b)(1). Because the agent's credibility was the "very essence of the defense," this court held the trial court abused its discretion. *York,* at 36–37.

Here, there was the corroborating physical evidence of the semen stain. We conclude Mr. McElroy's credibility, unlike that of the agent in *York,* was not sufficiently "crucial" to the State's case or Mr. Robinson's defense for us to conclude the court abused its discretion in restricting the inquiry. *See* 5 K. Tegland, Wash. Prac., *Evidence* §§ 229, 232 (2d ed. 1982 & Supp. 1986). *State v. Martinez,* 38 Wn. App. 421, 685 P.2d 650, *review denied,* 102 Wn.2d 1020 (1984). Even if the failure to allow the inquiry under ER 608(b) was error, the error would not have been prejudicial given the other evidence. *State v. Ferguson,* 100 Wn.2d 131, 137, 667 P.2d 68 (1983).

## Reputation for Truth and Veracity

 Mr. Robinson also argues the court erred in not permitting him to introduce evidence of his reputation for truth and veracity. He maintains, based on *State v. Petrich,* 101 Wn.2d 566, 683 P.2d 173 (1984), that the reputation of a defendant for truthfulness is always at issue in a case of this type. However, *Petrich,* at 575, merely holds that "[c]ases involving crimes against children generally put in issue the credibility of the *complaining* witness". Rather, *State v. Harper,* 35 Wn. App. 855, 859–60, 670 P.2d 296 (1983), *review denied,* 100 Wn.2d 1035 (1984) is controlling; *Harper,* at 859–60, provides: "Defendant's character trait for truthfulness is not a trait pertinent to the charge of indecent liberties". Other traits such as his honesty and truthful reputation makes it no less likely he committed the offense of indecent liberties. *Harper,* at 859–60. The prosecution did not attack Mr. Robinson's reputation for truthfulness. We find no error.

## Jury Instructions

 Mr. Robinson argues the trial court erred in failing to give his proposed instruction 14, advising the jury that evidence of good reputation alone may create a reasonable doubt of guilt. Instead, the court instructed: "Evidence has been admitted which bears upon the good character and reputation of the defendant. That evidence should be considered by you, along with all other evidence, in determining whether the defendant's guilt has been proven beyond any reasonable doubt." In *State v. Mark,* 94 Wn.2d 520, 525–26, 618 P.2d 73 (1980), the identical issue was raised and noted that it is not reversible error to exclude language to the effect that such "evidence may in and of itself create a doubt as to the guilt of the defendant". The instruction given here was sufficient since it correctly stated the law, was not misleading, and permitted counsel to argue his theory of the case. *State v. Dana,* 73 Wn.2d 533, 439 P.2d 403 (1968). There was no error.

PROSECUTORIAL MISCONDUCT

Finally, Mr. Robinson contends certain remarks of the prosecutor made during final argument constitute prosecutorial misconduct. We disagree. The comments, to which counsel for Mr. Robinson objected, were: "First, *assume that Randy McElroy is telling the truth* . . . for the moment assume Randy McElroy did not come into the courtroom and place himself in jeopardy for a perjury conviction . . ." (Italics ours.) The prosecutor continued: "[W]hy would a three–and–a–half–year–old girl make up a story like that? . . . [Y]oung girls that age or young boys that age don't make up stories like that." Later, he argued:

> There's an irony here that the same things about that three–and–a–half–year–old girl that made her unable to say "no" to the defendant on March 17th—the same things that made her unable to defend herself on March 17th, 1984, *are the same things that the defendant's attorney is using to get the defendant off—to have the defendant not take responsibility for what he did.*

(Italics ours.)

A prosecutor may not express his personal opinion about the credibility of a witness and the guilt or innocence of the accused during closing argument. *State v. Reed,* 102 Wn.2d 140, 145, 684 P.2d 699 (1984). However, prejudicial error does not occur until it is clear the prosecutor is not arguing an inference from the evidence, but is expressing his personal opinion. *State v. Papadopoulos,* 34 Wn. App. 397, 400, 662 P.2d 59, *review denied,* 100 Wn.2d 1003 (1983). Here, the challenged statements are simply inferences the prosecutor wished the jury to accept. Such comments, when taken in context, are not prohibited expressions of personal opinion. *Papadopoulos,* at 400.

We affirm.

GREEN, C.J., and THOMPSON, J., concur.

Review denied by Supreme Court October 28, 1986.